721 F.2d 934
 1984 A.M.C. 851
 Alean Hester FAUST, Administratrix of the Estate of Charles
Lonnie Faust, deceased, Tommy Bennett, Curtis L.
Muldrow, Appellees,
v.
SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Appellant,
and
United States of America, Defendant.
Alean Hester FAUST, Administratrix of the Estate of Charles
Lonnie Faust, deceased, Tommy Bennett, Curtis L.
Muldrow, Appellees,
v.
SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Defendant,
and
United States of America, Appellant.
 Nos. 82-1288, 82-1289.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 9, 1983.
Decided Nov. 1, 1983.
Rehearing and Rehearing En Banc Denied Dec. 13, 1983.
 
 Ellison D. Smith, IV, Charleston, S.C. (Long, Smith & Jordan, Charleston, S.C., Daniel R. McLeod, Atty. Gen., John M. Cox, Asst. Atty. Gen., Columbia, S.C., Amy Gibson, Staff Atty., Barnwell, S.C., on brief), for appellant S.C. State Highway Dept.
 Allen vanEmmerik, Dept. of Justice, Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Henry Dargan McMaster, U.S. Atty., Columbia, S.C., Mark A. Dombroff, Director, Torts Branch, Civil Div., Dept. of Justice, Washington, D.C., Stan Barnett, Asst. Dist. Counsel, Dept. of the Army, Charleston, S.C., on brief), for appellant United States.
 Douglas Hinds, Georgetown, S.C. (Hal M. Strange, Hinds, Cowan & Strange, Georgetown, S.C., Reginald C. Brown, Jr., J. Anderson Berly, III, Hyman, Morgan, Brown, Jeffords, Rushton & Fallon, Florence, S.C., D.A. Brockinton, Jr., Brockinton, Brockinton & Smith, Charleston, S.C., on brief), for appellees.
 Before WINTER, Chief Judge, WIDENER, Circuit Judge, and WYZANSKI,* Senior District Judge.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 The decedent of the plaintiff administratrix was killed and the two other plaintiffs were injured when, on the night of December 11, 1977, the decedent's motorboat collided with a steel guide cable used by the South Carolina State Highway Department (Highway Department) in the operation of a cable ferry across a canal in the Atlantic Intracoastal Waterway. Plaintiffs sued the United States and Highway Department in admiralty alleging that they were joint tortfeasors in the operation and maintenance of the ferry. The district court gave judgment to the administratrix against both defendants for $499,069.00 and to the other plaintiffs for $18,000.00 and $5,000.00, respectively, with prejudgment interest. Both defendants appeal.
 
 
 2
 We reverse. We conclude that there was no negligence on the part of the United States, and it is entitled to judgment as a matter of law. While we conclude that there may have been negligence on the part of the Highway Department, as well as contributory negligence on the part of the decedent and the other plaintiffs, we think it necessary to reexamine our decision in Chesapeake Bay Bridge and Tunnel District v. Lauritzen, 404 F.2d 1001 (4 Cir.1968), on which the liability of Highway Department was predicated. We conclude that Lauritzen has been sufficiently undermined by subsequent Supreme Court decisions that it should no longer be followed. As a consequence we conclude that under the Eleventh Amendment Highway Department is not amenable to suit and we reverse the judgment against it.
 
 I.
 
 3
 In the view we take of the case, the facts need not be elaborately stated.
 
 
 4
 On the night of the tragedy--a Sunday, the decedent, Charles Lonnie Faust, together with plaintiffs, Tommy Bennett and Curtis L. Muldrow, went fishing in Faust's eighteen-foot open inboard/outboard motor boat in unfamiliar waters, near Georgetown, South Carolina. They launched the boat from a public landing on the Sampit River to which they had been directed and they fished in an area to which they were taken by a professional fisherman who accompanied them after they encountered him on the water in his disabled boat. After fishing for several hours and collecting shellfish, they returned to their guide's disabled boat where he left them. He gave them directions how to return whence they had come, but because they erroneously identified their point of origin, he directed them to a landing in close proximity to one of the landings of the South Island ferry. In addition to no familiarity with the waters of the area, they neither had, nor had they consulted, any maps or charts.
 
 
 5
 The South Island ferry is a cable operated ferry, operating across a canal of the Intracoastal Waterway. Since 1940, it has employed a separate 5/8 inch steel guide cable. When not in operation, the ferry is moored on the east or island side of the canal and the guide cable is slack and rests on the bottom. When the ferry is in operation the guide cable is raised to four feet above the water's surface.
 
 
 6
 Prior to December 11, 1977, there had been a number of collisions between boats and the ferry cable.[1] There was an elaborate system of warnings about the hazard of the ferry and the cable. When the ferry is in operation various warning lights and sirens are activated. Two signs, having flashing red lights and flood lights, were posted on either side 500 feet northeast of the crossing, the direction from which Faust approached, as well as south of the crossing. The crossing is approximately 300 feet wide. The signs variously advise that there is a cable ferry 500 feet ahead, that the cable is above water when the ferry is in operation and that mariners should stop on red. The sides of the ferry, painted with luminous paint in a black and orange striped pattern, also bear signs reading "Cable Ferry--Stop on Red". Some of these warning devices were installed after the litigation in Doyle, see supra note 1, when a district judge voiced sharp criticism of the hazard. Other warning devices recommended by the Corps of Engineers had not yet been established. On December 11, the United States Corps of Engineers was also pressing for replacement of the ferry and South Carolina was in the process of procuring a self-propelled ferry.
 
 
 7
 After the guide was returned to his disabled boat, Faust entered the Intracoastal Waterway and proceeded down the middle of the channel at a planning speed of 15-25 m.p.h. It was dark; the weather was good; and the tide, against which Faust was proceeding, was rising. The ferry was in operation, but the Faust boat passed the warning signs without decrease in speed and struck the cable. Faust was killed and his passengers injured. Apparently the speed of the boat drowned out the sirens which were sounding.
 
 II.
 Liability of the United States
 
 8
 The district court found liability on the part of the United States. Since it was an uncontested fact that the cable ferry operated in navigable waters of the United States, the district court reasoned that the United States was "charged by law with various responsibilities and duties concerning the cable ferry" which the United States failed to carry out. Specifically the district court held that the Coast Guard failed to carry out its duty under 14 U.S.C. Sec. 86 to mark properly an obstruction in navigable waterways. The district court also held that the Coast Guard breached its duty, imposed by case law, to warn mariners of hidden dangers to navigation. The Corps of Engineers, so the district court ruled, had a duty under 33 U.S.C. Secs. 401 et seq. to remove obstructions to navigation in the navigable waters which it failed to perform when it took no steps to ensure that Highway Department had supplemented its warning system or removed the cable. Finally, the district court appeared to conclude that the Corps of Engineers had breached its common law duty to remove obstructions or to require that they be properly marked.
 
 
 9
 We do not doubt that if the United States, through the Coast Guard or the Corps of Engineers, breached some duty imposed by statute or the common law by failing to mark the cable adequately or to require its removal, plaintiffs would have a meritorious cause of action against it under the Suits in Admiralty Act (SIAA). See 46 U.S.C. Sec. 742;[2] Lane v. United States, 529 F.2d 175 (4 Cir.1975) (Coast Guard's failure adequately to mark wreck is actionable under SIAA). The question however, is to determine if the Coast Guard and Army Corps of Engineers' actions or inaction violated some statutory or common law duty. As a source of such a duty, plaintiffs and the district court cite two statutes--14 U.S.C. Secs. 81 and 86,[3] which empower the Coast Guard to establish aids to navigation and mark obstructions, and 33 U.S.C. Sec. 403, which requires Army authorization of structures placed in navigable waters--and the common law duty, recognized in Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), of one who undertakes to warn the public of a danger to do so in a careful manner. We consider these sources seriatim.
 
 A. 14 U.S.C. Secs. 81, 86
 
 10
 Section 81 states, in pertinent part, that "[i]n order to aid navigation and to prevent disasters, collisions and wrecks of vessels ... the Coast Guard may establish, maintain, and operate: (1) aids to maritime navigation required to serve the needs of ... the commerce of the United States ...," while Sec. 86 states, insofar as pertinent, that "the Secretary may mark for the protection of navigation any sunken vessel or other obstruction existing on the navigable waters ... in such manner and for so long as, in his judgment, the needs of maritime navigation require." It further provides that the Secretary may charge the owner of the obstruction for costs incurred in marking it. Prior to 1965 Sec. 86 was phrased in mandatory terms, and the Army was charged with marking abandoned wrecks.
 
 
 11
 We have twice had occasion to rule on the duty imposed on the Coast Guard by these two sections. In Lane v. United States, 529 F.2d 175 (4 Cir.1975), we held that the United States could be held liable for damage caused to a pleasure boat by a collision with a poorly marked sunken barge. We concluded that while, after the 1965 amendments, the duty to mark was not mandatory, the section "at least, requires care and prudence to mark submerged wrecks which constitute substantial hazards to navigation." Id. at 179. In Magno v. Corros, 630 F.2d 224 (4 Cir.1980), on the other hand, we ruled the United States could not be held liable for the Coast Guard's alleged failure adequately to mark a dike. We reasoned there that the duty to mark imposed by that section did not encompass things, such as the dike, which were placed as an aid to navigation and which were authorized by Congress. We concluded that "Sec. 86 is inapplicable to a structure ... which was constructed for a proper governmental purpose." Id. at 228. The cable, of course, is a purposefully constructed and not an accidental obstruction, and thus under our reasoning in Magno the Coast Guard was under no duty to mark it under Sec. 86. There could therefore be no breach of a duty to mark on the part of the United States.
 
 B. 33 U.S.C. Sec. 403
 
 12
 This statute prohibits the construction of any structure in a navigable river "except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." In fact a permit for operation of the ferry had been issued on condition that there be certain markings.
 
 
 13
 We do not think that the United States may be held liable for permitting an obstruction under Sec. 403. We know of no decision holding the United States liable in tort on the basis of an alleged failure by the Corps of Engineers to fulfill its statutory mandate to regulate obstructions placed in the navigable waterways.[4] The assumption by the government of authority to regulate a particular activity should not render it liable in tort when it fails to exercise that authority to protect an individual from injury. Zabala Clemente v. United States, 567 F.2d 1140 (1 Cir.1977), cert. denied, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). At common law an undertaking to protect a person from harm does not give rise to a duty enforceable in tort unless the undertaking is in satisfaction of an antecedent legal duty, or increases the risk of harm, or the person relies to his detriment upon the undertaking. Restatement of Torts 2d Sec. 323. Thus, at common law the undertaking by the United States to regulate obstructions in navigable waters does not, standing alone, give rise to a duty to do so enforceable in tort. Moreover, particularly strong reasons exist for not imposing such a duty upon the government, for that would deny to it the power to determine how best to allocate scarce resources to satisfy the wide range of ambitious regulatory programs which the government has undertaken. Gercey v. United States, 540 F.2d 536, 538-39 (1 Cir.1976).
 
 
 14
 It has authoritatively been held that the exercise of the function to issue permits is an unreviewable discretionary function. In California v. Sierra Club, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), the Supreme Court held that the provisions of the Rivers and Harbors Act, Sec. 401 et seq., did not provide a private cause of action to challenge the construction of an unpermitted structure in navigable waters. Similarly, several courts have held the grant of a permit thereunder to be an unreviewable discretionary function. See Gemp v. United States, 684 F.2d 404, 408 (6 Cir.1982) (decision by Corps to post warnings at dam is discretionary); Boston Edison Co. v. Great Lake Dredge & Dock Co., 423 F.2d 891 (1 Cir.1970) (decision by Corps to dredge river is discretionary, and so is not actionable under the Tort Claims Act); Lynch v. U.S. Dep't of Army Corps of Engineers, 474 F.Supp. 545, 550, 552 (D.Md.1978), aff'd without opinion, 601 F.2d 581 (4 Cir.1979). If the issuance of the permit is unreviewable, we cannot see how the United States can be held liable for having issued a permit to allow a hazardous obstruction to exist, because of necessity such liability would involve a determination either that the permit should not have issued, or, once issued, that it should have been revoked.
 
 
 15
 We thus conclude that the United States could not be liable in this case under 33 U.S.C. Sec. 403.
 
 C. Common Law
 
 16
 We are aware of no authority and counsel has cited none which holds that the United States may be held liable on a common law tort theory of failure to maintain safe conditions on navigable waters which it "owns." Of course, in Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the United States was held liable for damage sustained by a vessel which ran aground after a lighthouse light operated by the Coast Guard was negligently allowed to go out. The Supreme Court stated that once the Coast Guard chose to operate the light and engendered reliance on the guidance afforded by it, it was obligated to use due care to ensure the light was kept in operation. Id. at 69, 76 S.Ct. at 126. The principle laid down in Indian Towing requires no more than that the government not injure sailors or boaters by inducing reliance on misleading navigational aids. It imposes no general duty upon the government to ensure navigable waters are safe or to provide warning devices. In Magno v. Corros, 630 F.2d 224, 228 (4 Cir.1980), for example, we held that the Coast Guard could not be held liable under Indian Towing for failing to provide additional lighting or marking on a dike so long as the light it provided worked properly and did not mislead the boater. Similarly, in Chute v. United States, 610 F.2d 7, 13-15 (1 Cir.1979), it was held that allegedly inadequate warning devices were not actionable under Indian Towing so long as the devices provided worked properly.
 
 
 17
 Recognizing this limitation upon the liability of the government at common law, plaintiffs suggest Indian Towing is applicable here because lights placed on the ferry at the government's suggestion distracted them from the cable and thus misled them. When by its remedial measures the government misleads a boater and that causes an accident it is actionable under Indian Towing. We recognized that possibility in dicta in Magno, and at least one court has so held. Donily v. United States, 381 F.Supp. 901 (D.Or.1974) (United States liable for misleading weather information provided by Coast Guard). See also De Bardeleben Marine Corp. v. United States, 451 F.2d 140 (5 Cir.1971) (United States would be liable if it negligently furnished misleading charts to navigator). In the instant case, the district court found that the safety devices installed "actually increased the risk caused by the cable ferry," 527 F.Supp. at 1044, presumably because the flashing lights of a landed ferry would fool a boater into believing no danger existed. Id. at 1031-32. This, however, is no basis for finding liability on the part of the United States since it was not directly responsible for the safety devices installed.
 
 
 18
 In sum we do not perceive any basis for saying that the United States breached or failed to carry out any duty imposed on it by statute or by common law so as to render it liable in this case. Accordingly the judgment against the United States will be reversed.
 
 III.
 Liability of South Carolina
 
 19
 The district court found South Carolina liable,[5] but we conclude that the Eleventh Amendment[6] insulates it from a judgment rendered by a federal court. It would not be amiss for us to explain why we decide this aspect of the case on this ground.
 
 
 20
 From our examination of the record, we have no doubt that were South Carolina amenable to suit it should be held liable to some extent. It argues that plaintiffs are barred from recovery by their contributory negligence. The district court found that plaintiffs, and especially the decedent, were not guilty of contributory negligence as a result of the consumption of alcoholic beverages and that finding is not clearly erroneous. But there was other evidence of negligence--operating at excessive speed at night, without lights and without charts, in unknown waters--and we have no doubt that there was some negligence on the part of decedent and perhaps the other plaintiffs. This case, however, is one in admiralty where the doctrine of comparative negligence obtains, and we are unable to agree that negligence on the part of plaintiffs and the decedent was the sole proximate cause of the collision. It is appropriate therefore that we consider an aspect of the case on which we can reach a judgment. In addition, Edelman v. Jordan, 415 U.S. 651, 677-78, 94 S.Ct. 1347, 1362-63, 39 L.Ed.2d 662 (1974), states that an Eleventh Amendment defense is in the nature of a jurisdictional defense that may be raised at any time. Thus by deciding the case on this ground, we do no violence to the established canon that courts should not reach or decide constitutional issues except where they cannot be decided on non-constitutional grounds.
 
 
 21
 A state's defense under the Eleventh Amendment can, of course, be waived, and the district court concluded that under our decision in Chesapeake Bay Bridge and Tunnel District v. Lauritzen, 404 F.2d 1001 (4 Cir.1968), South Carolina had impliedly waived its right to immunity and consented to suit when it undertook to operate a ferry on a navigable body of water subject to federal regulation. We agree that application of the holding in Lauritzen to the facts of this case would result in that conclusion, but the decision in Lauritzen embodied a reading of Parden v. Terminal R. Co., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), which later Supreme Court decisions have shown is untenable. It follows therefore that Lauritzen is not a viable authority and should no longer be followed.
 
 
 22
 In Lauritzen, we said, quoting Parden, 377 U.S. at 196, 84 S.Ct. at 1215, that "when a state leaves the sphere that is exclusively its own and enters into activities subject to congressional regulation, it subjects itself to that regulation as fully as if it were a private person or corporation." We applied that language to mean that when Virginia constructed and maintained a bridge-tunnel spanning the Chesapeake Bay at the Virginia capes--clearly navigable waters of the United States--Virginia consented to be sued for damages sustained from a submerged obstruction in the waters.
 
 
 23
 The sweep of the language of Parden on which we relied has been sharply curtailed by two later decisions. In Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Eleventh Amendment question which was decided was whether Illinois had waived its Eleventh Amendment immunity and consented to be sued by participating in a federal-state program of aid to the aged, blind and disabled. Reliance for an affirmative answer was placed, inter alia, on Parden. The Court, however, said that a state waives its immunity by entering an area subject to congressional regulation only where the governing statute required such a waiver " 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.' " Id. at 673, 94 S.Ct. at 1360, quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909). With respect to Parden, the Court said that its rationale was that it "involved a congressional enactment which by its terms authorized suit by designated plaintiffs against a general class of defendants which literally included States or state instrumentalities". Id. 415 U.S. at 672, 94 S.Ct. at 1360.
 
 
 24
 Even before Edelman was decided, in Employees v. Missouri Public Health Dept., 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), the Court held that the Eleventh Amendment barred suit by state employees against the State of Missouri for overtime compensation under the Fair Labor Standards Act, because that Act, although it obligated Missouri to pay minimum wages and overtime, did not expressly repeal a state's Eleventh Amendment immunity. Parden was again limited to the fact that the state (Alabama) conducted an activity normally carried on by private persons and corporations and thus brought itself squarely within the terms of the statute authorizing the proprietor to be sued.
 
 
 25
 There is no claim in this case that there is any federal statute allowing a private cause of action against states for obstructing navigable waters or negligently operating a ferry. South Carolina has no state tort claims statute. All there is is the fact that South Carolina operates a ferry in navigable waters. But under Parden, as explained by Edelman and Employees, this is not an implied waiver of Eleventh Amendment immunity and consent to suit, notwithstanding Lauritzen to the contrary. Since we are obliged to follow Edelman and Employees, we must conclude that we should not follow Lauritzen and that there was no waiver of Eleventh Amendment immunity here and the judgment against South Carolina must be set aside. We add only that our conclusion on this point is in accord with every other court of appeals which has considered this issue. See, Karpovs v. Mississippi, 663 F.2d 640 (5 Cir.1981); Riggle v. California, 577 F.2d 579 (9 Cir.1978); Williamson Towing Co. v. Illinois, 534 F.2d 758 (7 Cir.1976). See also, Red Star Towing & Transp. Co. v. Dept. of Transp., 423 F.2d 104 (3 Cir.1970).
 
 
 26
 REVERSED.
 
 WYZANSKI, Senior District Judge, dissenting:
 
 27
 With the deepest respect for the opinion of my brethren who speak with the special authority of many years' experience as judges in this Circuit applying both federal law and the law, inter alia, of the State of South Carolina, I find myself unable to agree either with the way Chief Judge Winter has summarized the record in this case factually or, what is far more important, with his and Judge Widener's view of the bearing of the Eleventh Amendment of the United States Constitution and the federal admiralty law upon the facts of this case.
 
 
 28
 Because it seems to me likely that the Supreme Court will grant certiorari in this case, I set forth at unusual length the factual and legal grounds upon which I am basing my dissent.
 
 
 29
 I begin with the facts.
 
 
 30
 The administratrix of the estate of Charles Lonnie Faust, the late owner-operator of a pleasure motorboat (hereafter usually called "the vessel" or "the craft") and Faust's two passengers, Thomas Bennett and Curtis Muldrow, filed in the district court three parallel actions in admiralty, invoking the jurisdiction conferred by 28 U.S.C. Sec. 1333 and 46 U.S.C. Sec. 742. (For convenience we shall refer to Faust, Bennett, and Muldrow as "the plaintiffs," when more exactly we might have said "the administratrix's decedent and the two other plaintiffs"). The plaintiffs named as defendants South Carolina Highway Department (sometimes referred to as "the Department") and the United States. The complaints alleged that both defendants were liable for the death of Faust and injuries to Bennett and Muldrow when Faust's motorboat collided on the night of December 11, 1977 with a 5/8 inch steel guide cable (usually referred to as "the cable" or "the guide cable") lying over or under the surface of a canal in the Atlantic Intra-Coastal Waterway ("AIW") which admittedly constitutes "navigable waters of the United States." The South Carolina Highway Department, as owner, operated that trans-canal guide cable in conjunction with a canal ferry. The complaints further alleged that the negligence of the Department and of the United States caused Faust's death and Bennett's and Muldrow's injuries.
 
 
 31
 The district court held that the plaintiffs were free of fault but that the Department and the United States were equally at fault in causing the death and injuries, and that each of the defendants should pay as damages one half of (a) $499,069 to Faust's administratrix, (b) $5,000 to Bennett, and (c) $18,000 to Muldrow plus, in each of the three cases, interest.
 
 
 32
 Each defendant appealed to this court on the ground that the district court erred in concluding that the plaintiffs were without fault and that the defendants were at fault. The questions presented are, for the most part, the customary ones when personal injury claims are made in a federal court against a state agency and against the federal government, but this particular case requires us to give an unusually long recital first of the conduct of the plaintiffs before the accident, and then of the location, operation, and history of the guide cable and of the ferry which it guided. Our recital of those primary facts is for the most part drawn from the district court's specific findings, which are in every important respect supported by substantial evidence. In a few instances we have amplified our account by including other primary facts to be found, virtually without contradiction, in the extensive record of the trial. As to ultimate facts and the conclusions of law with which they are interwoven, we have not been quite so deferential to the district court, although in the end we come out with the same conclusion as the district court.
 
 
 33
 We start with the primary facts as to the plaintiffs and then as to the guide cable and the ferry.
 
 
 34
 On the morning of December 11, 1977 Faust, Bennett, and Muldrow in Faust's 18-foot open, inboard/outboard pleasure motorboat left South Carolina to go fishing in Winyah Bay which abuts the Estherville-Minim Canal ("the canal"), which in turn is part of the AIW and flows along the banks of Georgetown County, South Carolina.
 
 
 35
 None of the three had ever operated a vessel in salt water, or was familiar with the Winyah Bay area. However, Faust had had experience with small craft in fresh water and had taken a course in navigation safety. None of the plaintiffs had a nautical chart, and no chart was aboard the motorboat.
 
 
 36
 Shortly after the voyage began, the Faust party, by chance, picked up from his disabled boat Henry H. ("Happy") Hendricks, a commercial fisherman, resident in the Georgetown area, who agreed to accompany the trio to a fishing area known to him. After an afternoon of fishing and oyster-gathering, the party went to a locus where Hendricks had crab pots.
 
 
 37
 During the day the three plaintiffs had been drinking from a half bottle of Scotch whisky: only Bennett drank at the Georgetown landing, but all three of the original party had drinks at the time they encountered Hendricks; Faust may have had during the day as many as three drinks; Hendricks after joining the party had several drinks; Bennett had three drinks during the day; Muldrow had two drinks of which he spilled one; but it seems that no one had a drink after the party left the fishing area. Thus, by process of elimination, it seems that Faust, the motorboat's sole mariner, could have drunk at most a couple of ounces of a bottle of whisky which at the start was only half size.
 
 
 38
 As darkness approached, the four headed back to where Hendricks had joined the party. There Faust's vessel towed Hendricks' boat to Campbell's Landing. When they left Hendricks there, they asked him for directions to the "boat landing." Mistakenly, Hendricks supposed the trio sought directions to the South Island ferry and directed them accordingly. Following those misconceived directions, Faust at about 6:10 p.m. headed his craft from Winyah Bay into the Estherville-Minim Canal.
 
 
 39
 At this point in our account we, during the next thirty or so paragraphs, describe the ferry and the steel guide cable which had impact on Faust's vessel and also the warning system set up by the South Carolina Highway Department in connection therewith. This interruption in the narrative of the events of December 11, 1977 will later be justified by our recital of the primary facts as to what those on the Faust vessel might have observed and actually did observe on the night of the accident.
 
 
 40
 Across the canal at mile 411.5 the South Carolina State Highway Department had for 30 years operated and was still operating a cable ferry to provide trans-canal transportation between the Georgetown County mainland and South Island lying to the east. When at rest the ferry was berthed at South Island. In operation the ferry was propelled by a cable propulsion system, and guided and stabilized by a 5/8 inch steel cable affixed permanently to each side of the canal. (It is this steel guide cable which is of critical significance.) The operator of the ferry controlled its engine (which itself was located on land) by a manual throttle which was placed inside the ferry's cabin and was operable only from inside the cabin. When the ferry operator activated the engine the activation, even if the ferry was not yet on her voyage, caused the steel guide cable (which when the engine was idle lay below the surface of the water) to become taut and to rise to 4 feet above the water all the way across the width of the canal, thus blocking passage on the canal. From constant usage, the cable by 1977 had become a muddy brown color and was invisible at night.[1]
 
 
 41
 On December 11, 1977 there were, inter alia, the following warnings with respect to the guide cable.
 
 
 42
 There were four sets of signs with lights attached, referred to as "advance warning signs," intended to attract a vessel's attention before it reached the ferry and cable. One pole stood at each of four locations: (1) on the mainland side, 500 feet south of the ferry; (2) on the island side, 500 feet south of the ferry; (3) on the mainland side, 500 feet north of the ferry; and (4) on the island side, 500 feet north of the ferry. Affixed to each pole were three separate signs arranged vertically.
 
 
 43
 The sign on top was approximately 3-foot by 4-foot in size. It read as follows:5
 
 
 44
 M.P.H.
 
 By Order of
 U.S.C.G.--COTP
 33 CFR--160
 
 45
 The legend consisted of white letters and numbers on a red background. The "5" was printed in 12-inch letters, and the "M.P.H." in 4-inch letters.
 
 
 46
 Under this sign was a 5-foot by 12-foot sign which read:
 
 CAUTION
 CABLE OPERATED FERRY
 500--FEET AHEAD
 STOP ON RED
 
 47
 The word "Caution" was printed in 12-inch black letters on a red background. The portion of the sign stating "Cable Operated Ferry--500 Feet Ahead" was in 12-inch black letters on a white background. The "Stop on Red" message appeared in 9-inch black letters on a red background.
 
 
 48
 The bottom sign, 2-foot by 9-foot in size, bore the message:
 
 CABLE ABOVE WATER WHEN FERRY IN OPERATION
 
 49
 This legend was printed in 8-inch black letters on a white background.
 
 
 50
 Each set of signs at the four locations was placed in a position perpendicular to the waterway. Each was lighted by two spotlights which operated continuously after dark. Each had two red-flashing "wig-wag" lights which operated when the ferry was making a crossing. Each set of signs on the South Island side of the waterway had, in addition, (1) two sirens on the top of the middle sign which were activated when the ferry was making a crossing, and (2) a red strobe light, also turned on during a crossing, near the sirens on the middle sign.
 
 
 51
 The ferry itself had mounted on it five revolving red lights similar to those used on police and fire vehicles, and a red strobe light atop its 16-foot mast--all of which operated when the ferry was making a crossing. The ferry was equipped also with a battery-operated siren, but this siren had to be activated manually by the operator from inside his cabin, and so could not be turned on when the ferry was docked at the mainland side. In addition, the ferry had on its stripes in orange and white fluorescent paint and a sign reading "Cable Ferry Stop on Red."
 
 
 52
 The steel guide cable itself was marked by only two standard-size Highway Department stop signs, mounted in a wooden frame. The signs, attached to the guide cable just behind the ferry, are called "trailing stop signs" because they rose above the water's surface along with the cable when the ferry's engine was on. The stop signs were not lighted in any manner whatsoever, and were not visible in the dark.
 
 
 53
 The ferry landing areas on both sides of the waterway were lighted at night with mercury vapor street lights like those on city streets. Those lamps, the lights on the ferry, and the lights on the advance warning signs were visible to a vessel's crew from the time the vessel entered the Estherville-Minim Canal from Winyah Bay.
 
 
 54
 In addition to the signs, lights, and markings placed at the site of the South Island ferry by the Highway Department, notice of the ferry cable was afforded mariners in various issues of the Local Notice to Mariners ("Local Notice " ), published by and available from the regional office of the United States Coast Guard, supplementing the Coast Guard's nautical charts and the National Ocean Survey's publication Coast Pilot. Although the editions of the nautical charts depicting the Estherville-Minim Canal available in 1974 contained only the notation, "Cable Ferry," and the March 26, 1977 edition of at least one relevant chart (Chart No. 11534) apparently said nothing more, the additions to the charts contained in Local Notice (to which we next turn) did describe more specifically the cable.
 
 
 55
 The June 8, 1977 Local Notice warned mariners as follows: "The South Island Ferry's cable is dropped to the bottom only when the ferry is moored to the east side. Warning signs north and south of the ferry crossing are topped with red lights which flash when the ferry is in operation. There are also flashing red lights on the ferry itself."
 
 
 56
 The August 10, 1977 Local Notice revised that message to read as follows: "The cable is suspended during crossings and dropped to the bottom only when the ferry is moored to the island (east) side. Warning signs north and south of the ferry are equipped with red lights which flash when the ferry is in operation. In addition, flashing red lights are on the ferry itself. DO NOT ATTEMPT TO PASS A MOVING CABLE FERRY."
 
 
 57
 Moreover, the November 2, 1977 Local Notice contained the following additional statement: "In accordance with Title 33 Code of Federal Regulations, Part 160.35(B), Captain of the Port, Charleston, South Carolina orders that until further notice Intracoastal Waterway traffic shall observe a speed limit of five MPH between the signs marking the South Island cable ferry crossing at mile 411.5 on the Intracoastal Waterway. The signs are placed one-quarter mile on either side of the crossing."
 
 
 58
 We now return to our narrative of Faust's December 11, 1977 voyage.
 
 
 59
 With Faust at the wheel, and his head above the level of the windshield, his vessel proceeded at a speed of 15 to 25 miles per hour down the middle of the canal. Bennett stood in the passenger area with his face looking forward and his head above the level of the windshield. Muldrow, looking aft, sat in a passenger seat behind Faust.
 
 
 60
 The tide was rising; the night was dark, clear and cold. The boat travelled the canal toward the ferry's 5/8 inch steel guide cable which was taut and spanning the canal approximately 4 feet above the water. The cable was fastened to the ferry, from which on that night its operator was intermittently discharging its cargo of cars on the mainland side of the canal. The ferry's lights were lit. The ferry's siren, though in an operative condition, was not being continuously sounded, as the ferry operator from time to time while discharging cargo temporarily left the cabin where the siren was controlled. Even if the siren had been operating, it could not have been heard above the roar of the engine on the Faust vessel by those on that vessel.
 
 
 61
 As the Faust vessel proceeded down the canal, and as it passed the warning signs, we do not know what the no-longer living Faust saw or heard; Bennett saw only a "blur"--"something shining" to his left--and he heard the siren only as the vessel struck the cable. Muldrow did not see the signs; but, like Bennett, heard the siren at the moment of impact.
 
 
 62
 As it approached the cable, the vessel did not slow down nor alter its course.
 
 
 63
 The vessel's bow passed under the cable, and the vessel's windshield struck the cable. The impact hurled Faust to the bottom of the boat and, injuring his neck and head, virtually instantly killed him. The impact threw Bennett from the vessel into the water; it tossed Muldrow inside the boat and rendered him unconscious.
 
 
 64
 Next, we consider the previous history of the steel guide cable and its predecessors, if any.
 
 
 65
 Between 1955 and 1975 the ferry and its cable had been involved in approximately 40 accidents, in most of which pleasure boats collided with the cable. Of those 40 accidents, the South Carolina Department of Marine and Wildlife Resources investigated 7 and made reports thereon to the United States Coast Guard. The Coast Guard investigated 2 of those 7 reported accidents and also 3 additional accidents.
 
 
 66
 Among the 1955-75 accidents the most significant for present purposes was that in which one Fulton was killed in 1974 when his vessel struck the same cable, or a cable similar to the one which in 1977 caused the death of Faust and the injuries to Bennett and Muldrow.
 
 
 67
 When the Fulton accident occurred in October 1974 the warning system was somewhat less elaborate than when the Faust accident occurred: for example, then the siren was operative only before the ferry began a canal crossing from the island side; not all the warning signs were illuminated; and relevant nautical charts available in 1974 did not disclose as did the 1977 charts that a cable ferry crosses the Intracoastal Waterway at mile 411.5.
 
 
 68
 Concerning the Fulton accident, United States Coast Guard Commander Stewart, the officer in charge of Marine Inspection for the zone of South Carolina, on November 20, 1974 informed his superior, also a commander, of the hazard of the cable, and indicated that approaching vessels, despite the warning signs, might not see the cable, but only the ferry. Stewart reported to his superior that he had consulted on November 18, 1974 with officials of the South Carolina Highway Department, and that that agency was taking the following steps to improve the situation: (1) installing a switch to allow the ferry operator to lower the guide cable when the ferry was moored to the mainland side; (2) installing on the ferry a siren to be accessible to the operator at all times; (3) putting up four additional signs to indicate more clearly the danger from the cable; (4) looking into alternative means of providing access to and from South Island, including a bridge or self-propelled ferry; and (5) cooperating with the Coast Guard to conduct a training program leading to the issuance of licenses for the ferry operators. Stewart advised his Commander that "it is not in the best interest of the Coast Guard for this [ferry] to become a Coast-Guard vessel." He closed his letter by saying that "[c]ompletion of the previously mentioned improvements should result in as safe an operation as is possible with a cable ferry," though his "recommendations to the State Highway Department [would] contain a statement to the effect that the only permanent means of removing the hazard from the cable-type operation is to remove the cables themselves." (Emphasis added.)
 
 
 69
 On November 21, 1974, Stewart wrote to the Highway Department's District Engineer, Mr. Catoe, who was responsible for all maintenance, construction, and engineering activities in the area, "to provide [Catoe] with recommendations intended to assist ... in safety improvements at the South Island Ferry." He informed Catoe that "the only permanent means of removing this hazard is to remove the cables themselves." Stewart suggested that, until that could be done, the State should make the changes he had described in his November 20 letter to the Commander. In addition, Stewart recommended (1) that the four additional signs proposed be placed at least another 500 feet north and south of the present signs (for a total distance of 1000 feet away from the ferry cable), in order to allow vessels sufficient space in which to maneuver, and (2) that the guide cable itself be installed on a lower position on the ferry, so that the risk of injury to persons as opposed to vessels would be diminished.
 
 
 70
 On November 21, 1974, Catoe, in a memorandum to Mr. Cobb, the State Highway Engineer of the Highway Department, indicated that the following changes, approved by Commander Stewart, were to be implemented at the ferry site: (1) installation of new advance warning signs, to be illumined by 12-inch wig-wag warning lights; (2) painting on the ferry of stripes in orange and white fluorescent paint; (3) mounting on the ferry of one 3-foot by 16-foot warning sign on each side of the vessel; (4) installation of a red strobe light on the mast of the ferry; (5) installation of one red strobe light on each side of the waterway, to operate only when the ferry was in operation; and (6) installation of a switch, to allow the guide cable to be lowered by the operator from the mainland side of the canal. Catoe requested the State Highway Engineer's permission to make these changes, at an estimated cost of $3,500. Catoe's memorandum contained a postscript enclosing the additional recommendations made in the November 21 letter from Stewart to Catoe.
 
 
 71
 On December 5, 1974, Cobb replied to Catoe, approving the changes proposed in Catoe's November 21 memorandum and further directing Catoe to comply with the terms of Stewart's November 20 letter and to give consideration to the changes suggested in Stewart's November 21 letter.
 
 
 72
 Between October, 1974 and October, 1975, the Highway Department made some of the improvements recommended by Stewart and approved by Cobb, as well as certain other changes. The plan to install a switch to permit the lowering of the cable from the mainland side was never implemented. Nor was the guide cable ever placed at a lower position on the ferry. The additional signs warning specifically of the hazard of the cable were not erected. Stewart did not follow up to see if the recommendations made by him had been carried out by the Highway Department.
 
 
 73
 On October 9, 1975, Fulton's estate and Feaga individually filed suit against the United States and the South Carolina State Highway Department for damages occasioned by the wrongful death of Fulton and the injuries sustained by his companion Feaga.
 
 
 74
 Between November, 1975 and April, 1977, the Highway Department, inter alia, installed back-up sirens on the advance warning signs north and south of the ferry, erected a warning sign at the public boat landing adjacent to the ferry site, placed on the ferry itself the 3-foot by 16-foot warning sign consisting of orange and white stripes, and installed on the cable trailing stop signs.
 
 
 75
 On April 1, 1977, United States District Judge Blatt, after concluding the trial on March 28-31, 1977 of the case arising out of Fulton's death, Doyle v. United States, 441 F.Supp. 701 (D.S.C.1977), wrote to Cobb a letter in which he stated in part:
 
 
 76
 Despite the number of accidents prior to the fatal accident [involving Fulton] and the warnings and letters written since October, 1974, very little has been done to remedy the situation [existing at the South Island ferry]. Not only did testimony reveal what I think is the most dangerous hazard to navigation that can be imagined, but at the request of counsel for both sides, I visited the scene, and in my opinion, the situation was even more dangerous than I had anticipated .... I am thoroughly convinced that someone else will be killed or badly injured unless you do review your files on this crossing and install a safer method than is now used.
 
 
 77
 On April 6, 1977, the Commander of the Seventh Coast Guard District in Miami, Florida wrote to the successor of Commander Stewart, as Officer in Charge of Marine Inspection for the South Carolina zone, to advise him that during the trial of the Doyle case, it had come to light that (1) "the condition set up in one of the letters from Commander Stewart, for additional signs approximately 1000 feet up and down the waterway from the ferry cable, has not been complied with"; (2) the ferry was carrying more passengers than permitted by law; (3) the duties required of the ferry operator prevented him from keeping a proper lookout; and (4) the "ferry appears to operate with an absolute minimum of supervision, by anyone who is concerned with, or has knowledge of, maritime law and regulations."
 
 
 78
 On April 7, 1977, Cobb wrote a reply to Judge Blatt's April 1, 1977 letter. Cobb stated that he felt that all feasible safety suggestions from the Coast Guard had been implemented. He stated further that the Highway Department was discussing with the South Carolina Attorney General four alternatives:
 
 
 79
 1. Continue operation of the present ferry, with the resulting liability that may be involved,
 
 
 80
 2. Change the present ferry operations to a self-propelled type which would involve a substantial expenditure,
 
 
 81
 3. Construct a bridge structure to the Island for which the Department has no program for funding, or
 
 
 82
 4. Discontinue the ferry operation.
 
 
 83
 On May 16, 1977, Captain Mitchell of the Coast Guard's Office of Marine Safety in Charleston, South Carolina wrote to Catoe telling him (1) to advise the ferry operators that carrying more than 6 passengers on the ferry would subject the State of South Carolina and the operator to a $1,000 penalty for each violation, (2) to advise the ferry operators to maintain a proper lookout, and (3) that if the ferry operators were given a 3-cell flashlight they could warn approaching vessels of the cable at night by shining the light on the cable and the stop signs attached to it.
 
 
 84
 The ferry operators were never equipped with the 3-cell flashlight referred to above.
 
 
 85
 On August 17, 1977, the United States Army Corps of Engineers concluded that it had responsibilities concerning the operation of the South Island ferry. On that date Colonel Rees, the Acting Division Engineer of the South Atlantic Division of the Army Corps of Engineers in Atlanta, Georgia, wrote to Colonel Brown, the District Engineer of the Corps in Charleston, South Carolina, stating that:
 
 
 86
 1. The South Island ferry ... is not a bridge and as such the ferry and the cables ... are not subject to regulation under the 1973 Memorandum of Agreement between the US Coast Guard and the Chief of Engineers.
 
 
 87
 2. Ferry cables are subject to regulation by the Corps ... under Section 10 of the 1899 Rivers and Harbors Act. This finding is substantiated by the reference to requirements for ferry cables on page 4, paragraph 11, of EP 1145-2-1 dated October 1974 (Gray Book) and 33 CFR 322.5(i)(3) printed 19 July 1977 in the Federal Register.
 
 
 88
 3. Inasmuch as the cables have been found by a Federal District Court to be dangerous and a hazard to navigation, the District should coordinate with the State and the Coast Guard to determine if additional warnings and/or posting is warranted and to seek voluntary removal of the cables. In the event that you are unsuccessful in voluntary removal, the District should take appropriate legal action concerning a 403 structure.... (Emphasis added.)
 
 
 89
 On September 8, 1977, Brown wrote to the successor of Cobb as State Highway Engineer, Mr. Coffey, and requested a meeting with officials of the Highway Department, "to formulate a course of action to abate any existing or foreseen hazard to navigation which [the South Island ferry] may pose." Brown stated in the letter that "the Corps of Engineers is the federal agency primarily responsible for this type of activity, and as such, it has the lawful authority to permit and/or regulate its continued operation."
 
 
 90
 At a meeting held on October 14, 1977, between representatives of the Corps, the Coast Guard, the Highway Department, and the Wildlife and Marine Resources Department, the Coast Guard Commander stated that he had viewed the warning system at the ferry location and that it was adequate. A representative of the Corps, however, stated that the present operation of the ferry was hazardous and that it was only a matter of time before the Corps would have to close it down.
 
 
 91
 On October 23, 1977, there was an accident involving the South Island ferry cable in which three persons were injured.
 
 
 92
 On October 28, 1977, Brown, prompted by that recent accident, sent a telegram to Coffey in which he (1) requested a meeting on November 3, 1977 "to develop specific plans to remedy the South Island Ferry situation," and (2) directed the Highway Department, "pursuant to authority vested in the District Engineer by regulations promulgated under the Rivers and Harbors Act of 1899," to "minimize the operation of the ferry by restricting its use to the compelling needs of the South Island residents and those County, State and Federal Government personnel whose presence on the Island is necessary to the performance of their official duties."
 
 
 93
 On November 3, 1977 there occurred the requested meeting of the representatives of the Corps, the Coast Guard, and the Highway Department, as well as other interested parties.
 
 
 94
 On November 8, 1977, Coffey wrote to Brown, informing him that a schedule had been devised under which the ferry would operate on the hour, twenty-four hours a day, and that this schedule would reduce the number of ferry crossings from 30 to 24 per day. Coffey also stated that (1) a back-up siren would be installed on each side of the ferry, (2) the orange-and-white stripes on the side of the ferry had been repainted, and (3) speed limit signs reducing the speed of boats in the canal to 5 miles per hour had been erected on each side of the ferry crossing.
 
 
 95
 On November 17, 1977, Coffey wrote to Brown advising him that the ferry would be operated every hour on the half-hour, instead of on the hour as proposed in the November 8 letter, and seeking the Corps' approval for this schedule.
 
 
 96
 On November 18, 1977, United States District Judge Blatt, in the Doyle case, supra, 441 F.Supp. at 701, found that the injuries to the Doyle plaintiffs were caused by the negligence and abuse of discretion of the Corps and the Coast Guard in failing adequately to warn vessels of the danger of the ferry cable and in failing to take steps to improve the safety of the situation.
 
 
 97
 On November 22, 1977, Brown wrote to Coffey, in response to Coffey's November 8 and 17 letters, that the proposed schedule for operation of the ferry would result in only a 25% reduction in the number of crossings and was therefore unacceptable to the Corps. Brown directed the Highway Department to: (1) have in effect by December 2, 1977 a plan for further reduction of the number of crossings, by scheduling "minimal operation of the ferry to serve the needs of the South Island residents only "; (2) alter the wording of the "existing warning signs ... to stress the fact that there is a cable across and above the water surface when the ferry is in operation, and (3) submit, as agreed in the November 3 meeting, by December 2, 1977, "plans for a permanent solution which will result in complete removal of the cable associated with the South Island ferry."
 
 
 98
 By a letter dated November 30, 1977, Coffey sent to Brown a revised schedule for operation of the ferry allegedly "based on the actual needs of the island residents." (Emphasis in original.) In this letter Coffey also advised Brown that the Highway Department was "proceeding with the alterations to the existing warning signs to state in positive terms that 'There is a cable across and above the water surface when the ferry is in operation.' "
 
 
 99
 On December 1, 1977, Coffey advised Brown that the Highway Department would post flagmen in boats upstream and downstream of the ferry, equipping those boats with flashing lights and electronic public address systems to be used to warn traffic of the hazard posed by the cable. Coffey stated his hope that the Corps would approve the State's proposal--consisting of the revised schedule, the alteration of the warning signs, and the stationing of the flagmen--to allow it to continue operating the ferry.
 
 
 100
 By separate letter of December 1, 1977, Coffey wrote to Brown confirming the Corps' extension of the deadline, from December 2 to December 5, 1977, for the Highway Department to submit plans for a permanent solution to the ferry cable problem. Coffey further stated that the Highway Department, with the assistance of the Wildlife and Marine Resources Department, contemplated taking prompt action to obtain funding for a permanent solution.
 
 
 101
 On December 6, 1977, the Highway Department installed the four bottom signs reading CABLE ABOVE WATER WHEN FERRY IN OPERATION which existed on the night of the Faust accident, as earlier stated.
 
 
 102
 On December 9, 1977, Brown wrote to Coffey that the Highway Department's plans to implement the revised schedule, add warnings to the existing signs, and post flagmen in the canal "were satisfactory and in compliance with [Brown's] latest instructions." Brown reiterated "[the Corps'] serious concern over the [ferry cable hazard] and [urged] that [the Highway Department] secure an early removal of [the] cable." Brown neither set time limits, nor took actions to verify, the State's completion of these goals.
 
 
 103
 On December 11, 1977 there occurred the collision involving the Faust boat which is the subject of the case at bar.
 
 
 104
 On December 12, 1977 the Highway Department authorized its District Engineer to hire flagmen to operate the advance warning flag boats proposed by Coffey to Brown in the December 1 letter.
 
 
 105
 After December 11, 1977, Highway Department officials began corresponding with representatives of an engineering firm regarding the design of a self-propelled ferry. Brown and Coffey continued to correspond about the ferry. Specifications for the new self-propelled ferry were completed in January 1978 and a contract was let for the construction of the ferry in February 1978.
 
 
 106
 In the meantime, on January 26, 1978, Brown wrote to Mr. Cobb, by then the Chief Commissioner of the Highway Department, a letter stating:
 
 
 107
 In accordance with ... 33 CFR 322.4(a), I have determined that the South Island ferry is a permitted structure since the cable was installed prior to 18 December 1968 and there was no evidence available to the Corps to indicate it posed a hazard to navigation before the recent accidents.
 
 
 108
 Based upon the evidence presented and the recent findings by a Federal District Court Judge, I have determined that continued operation of the cable ferry constitutes a hazard to navigation in the area. In accordance with 33 CFR 325.7 ..., I have reevaluated the circumstances and conditions of the South Island ferry permit and have determined that suspension of the permit is in the public interest ....
 
 
 109
 In the interim I consider that continued modified operations currently in effect may continue until 3 March 1978. At that time total suspension of the operation of the cable ferry must occur unless you receive approval for operation from this office.
 
 
 110
 The March 3, 1978 deadline referred to in the above letter was later extended to April 29, 1978.
 
 
 111
 On April 29, 1978 the self-propelled ferry was put into operation at a cost of approximately $100,000. The total cost of the new ferry was paid for by the Highway department out of funds that were on hand before December 11, 1977.
 
 
 112
 In its opinion, Faust v. South Carolina Highway Department, 527 F.Supp. 1021 (D.S.C.1981), the district court followed a path of reasoning which, although it included reference to principles of the common law of torts, also offered as an alternate basis for its conclusion certain federal statutes to which I need not refer.
 
 
 113
 Unlike my brethren, I agree with the district court's judgment that on the facts of this case each of the defendants is liable to each of the plaintiffs upon the basis of the principles of the modern common law of torts, which today, as Judge Learned Hand's admiralty opinions consistently taught, are universally recognized in the courts of the United States as being applicable in admiralty actions for personal injuries save where exceptions have been created or preserved by history, admiralty lore, or statutory command. See, for example, The T.J. Hooper, 60 F.2d 737 (2d Cir.1932) and comment thereon in Hershel Shanks, The Art and Craft of Judging, The Decisions of Judge Learned Hand 145, starred footnote (1968).
 
 
 114
 I concur with the conclusion of the majority of this court that the South Carolina Highway Department was negligent. The laws of both South Carolina and of the United States with respect to injuries occurring upon navigable waters are governed by the principle that a person who creates a structure or other artificial condition on land, or on water over land, whether the land be his own or another's, which he realizes or should realize will involve an unreasonable risk of physical harm to another is subject to liability to that other for such physical harm. Restatement (Second) Torts Sec. 364.
 
 
 115
 In the case at bar, on water over land, the Highway Department created a ferry cable which was (according to the evidence apparently believed by the district court) invisible at night, 527 F.Supp. at 1030, lines 9-10, by travellers proceeding at either a reasonable or unreasonable rate of speed on the channel. The Department's conduct, in creating such a cable was, as a matter of law, negligent toward Faust and his companions who were fellow travellers. Such negligence was the only proximate cause of the death of Faust and of the injuries sustained by Bennett and Muldrow.
 
 
 116
 Hence, I, contrary to the majority of this court, am of opinion that, quite apart from the issue of causation, there was as a matter of fact no contributory negligence on the part of Faust or Bennett or Muldrow. But I do not stop with that statement about lack of causation. I stress that the district court found as a fact that the defendant Highway Department and the defendant United States did not bear the burden, which rested upon them, of showing that Faust, Bennett or Muldrow was intoxicated. That finding is fully supported by the evidence: a half bottle of whisky, split among three or maybe four persons, consumed by drinking over a span of several hours in one afternoon does not indicate that any of the imbibers was intoxicated at or after 6:15 p.m. on December 11, 1977. The district court also, in effect, found that neither defendant bore the burden of showing that Faust or his companions were contributorily negligent in not possessing on board and examining, or examining without possessing, nautical charts or other available published data before they set off on their recreational fishing trip in the canal. The district court was fully supported by the ratio decidendi in Lane v. United States, 529 F.2d 175, 180 (4th Cir.1975). And in any event, the district court, independently of our own earlier guidance, was warranted in concluding that the plaintiffs' lack of familiarity with charts and the like did not constitute contributory negligence, especially since the defendants did not prove that those documents showed that the cable was invisible at night.
 
 
 117
 What is even more important is that were we to hold that Faust and his companions were at fault in having drunk whisky early in the day, or were at fault in not having read the available charts, or were at fault in proceeding at an unreasonably fast rate of speed, there would not be the slightest evidence to sustain the defendants' burden of proving that had there been no such fault the accident would not have occurred. The defendants have not shown that had Faust and his fellow travellers been attentive they would either have seen, or have been warned to take heed of, an INVISIBLE CABLE. The majority have invented a causation of which there is no evidence in the record and which is repugnant to the findings of the district judge.
 
 
 118
 I now come to what seems to me the Achilles heel in the majority's opinion--the holding that South Carolina Highway Department is immunized from suit in the federal court by the Eleventh Amendment which provides:
 
 
 119
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 120
 It is quite plain that the text of the Eleventh Amendment when read literally does not apply to this or any other suit in admiralty (as distinguished from a "suit in law or equity"), and does not apply to any type of action brought against a state by citizens of that state--such as this suit by Faust against his own state of South Carolina (as distinguished from a suit "against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."). However, more than half a century ago Ex Parte in the Matter of State of New York, No. 1, 256 U.S. 490, 497-500, 41 S.Ct. 588, 589-590, 65 L.Ed. 1057 (1921) conclusively settled that "the immunity of a State from suit in personam in the admiralty brought by a private person without its consent, is clear." Id. at 500, 41 S.Ct. at 590.
 
 
 121
 Thus the issue here is whether by its erecting a ferry cable as a structure over and in navigable waters, admittedly within the federal jurisdiction, the State of South Carolina impliedly waived its immunity from suit in the federal court for damages caused by the negligent operation of that cable while lying in navigable waters.
 
 
 122
 This question would be answered affirmatively were this court to adhere to the doctrine of Chesapeake Bay Bridge and Tunnel District v. Lauritzen, 404 F.2d 1001 (4th Cir.1968). But the majority of this panel are prepared to overrule that case, out of deference to cited opinions both of the Supreme Court and of inferior federal courts. In my opinion, the cited Supreme Court cases are not governing, and the cited inferior court opinions are either not sound or not applicable to this case.
 
 
 123
 I do not propose to subject to microscopic examination the cases cited by the majority, for I find a most helpful analysis of the relevant Supreme Court rulings has already been made by Lawrence H. Tribe, American Constitutional Law, 130-143 (1978)--pages which are set forth in an appendix to this opinion, inasmuch as probably they would regrettably be otherwise not readily available to the judges and bar of the Fourth Circuit and perhaps other circuits.
 
 
 124
 Stimulated by Professor Tribe's analyses, I first note that there is, so far as I am aware, no act of Congress which has explicitly provided that a person injured on navigable waters by another's negligent act in those waters shall have a cause of action in admiralty or otherwise. But such a person (or his representative if he has been killed by the other's negligent act) is nonetheless entitled to bring an action under federal maritime law against the wrongdoer, if he or it is a private person. Moragne v. States Marine Line Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).
 
 
 125
 Moragne stands for the proposition that there is a common--in the sense of non-statutory--law of federal origin, created by the federal judiciary, which applies to injuries in navigable waters.
 
 
 126
 Were there an act of Congress which had provided for the present action, then under the teaching of Parden v. Terminal Railway of the Alabama State Docks Dept., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964)--a case whose vitality was recognized last year in United Transportation Union v. Long Island Rail Road Co., 455 U.S. 678, 685, 102 S.Ct. 1349, 1354, 71 L.Ed.2d 547 (1982)--it is indubitable that the state of South Carolina in connection with the operation of a ferry cable over and in navigable waters would, despite general constitutional provisions inferentially including the Eleventh Amendment, have been subject to the jurisdiction of the United States courts in an action brought by a person who suffered damages through an injury caused by the state's or the state's agent's negligence. Operation of a ferry like "operation of a railroad engaged in interstate commerce is not an integral part of traditional state activities generally immune from federal regulation." United Transportation Union v. Long Island Rail Road Co., supra. Nor, by parallel reasoning, is it immunized, by the text of the Eleventh Amendment, from suit in the courts of the United States.
 
 
 127
 The majority opinion's failure to recognize the continued vitality of Parden is contra-canonical as the parts of Professor Tribe's book set forth in the appendix to this opinion demonstrate.
 
 
 128
 Of course, this case at bar is unlike Parden or United Transportation Union because here there is not a Congressional statute which explicitly provides for liability to persons injured by negligent acts performed on navigable waters. But the policy considerations which underlay Moragne v. States Marine Line's, Inc. dictate a conclusion that the absence of a statute is not a fatal flaw in the plaintiffs' case at bar. To be sure, where Congress has passed a relevant statute, there is a clear basis for saying that it is reasonable to suppose that state interests will have been adequately considered while the legislation was being adopted. But specific legislation is unnecessary on personal injuries. The whole trend of twentieth century legislation and other governmental activity would convince any objective observer that the American people by enactments of many types and manifestations of popular will intend to subject state and federal governments to liability for damages for personal injuries which such governments have negligently caused individuals. It would be a work of supererogation to recite the long list of indicia of that attitude. Cf. Moragne, supra.
 
 
 129
 Were the matter of liability of the Highway Department of South Carolina to suit in the federal courts on a personal injury claim of a person injured by the state's negligence on navigable waters doubtful, there would be a compelling reason on the facts of this case to sustain the state's liability here. This is not a case in which the plaintiffs were injured by a vessel owned by the state and licensed by the federal government to sail in navigable waters controlled by the federal government. Cf. Frankfurter, J. dissenting in Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 288, 79 S.Ct. 785, 793, 3 L.Ed.2d 804 (1959) lines 12-16. Here we are concerned with an injury inflicted by a structure on the navigable waters. Were there only a vessel involved, no one could suppose that the United States would itself become liable to a third person for an injury caused by the state's operation of the vessel. But it is otherwise with a structure placed by the state on navigable waters. If this structure be placed there with the consent, express or implied, or even the knowledge and acquiescence, of the United States, it is at least arguable (in fact, as I shall later demonstrate it is more than arguable) that the United States would be liable to third persons who are injured by the negligent construction, operation, or maintenance of the structure. Hence it is only reasonable for a court to infer that when the United States permitted the state to erect and maintain such a structure both the United States and the state contemplated an implied waiver by the state of its immunity under the Eleventh Amendment to suits brought by third persons based on negligent state construction, operation, or maintenance of the structure (i.e., the cable).
 
 
 130
 In short, I am of opinion that in the case at bar the Highway Department impliedly waived its Eleventh Amendment immunity.
 
 
 131
 I also disagree with the conclusion of the majority that the United States is not liable to the plaintiffs--and it seems to me that on this as on the preceding point this court has fallen into such fundamental and potentially mischievous error likely to mislead later courts as to furnish strong support for a petition by the plaintiffs for a writ of certiorari from the Supreme Court of the United States.
 
 
 132
 I can see no plausible ground for not applying, by analogy, to the United States the familiar principle that "the duty of maintaining a highway [on land or sea] in a condition safe for travel is ... placed upon the municipal subdivision [or other public body] which holds the highway open to the public for travel." Restatement (Second) Torts Sec. 349, comment b. In the case at bar it was the duty of the United States to travellers on its channel to maintain it free of an INVISIBLE ferry cable or alternatively in the clearest terms to warn travellers of this hidden and hardly to be anticipated hazard, the nature and danger of which were fully known to the responsible officers of the United States.
 
 
 133
 The argument that neither the Highway Department nor the United States should have been expected to take immediate action to make by phosphorescence or other means the cable wholly visible at night and to warn in the most explicit terms of the danger to life from the hidden cable is an argument that seems to prefer money to lives. So far as appears, it did not take a legislative act of South Carolina to buy phosphorescent paint and to post visible notices with explicit warnings. Any decent regard for the concern expressed by District Judge Blatt in his direct communication to the responsible federal officials, written after that judge sat in an earlier case parallel to the present case, probably would have saved Faust's life. I would affirm the district court's judgment awarding compensation to Faust's administratrix and his companions.
 
 To sum up the matter:
 
 134
 1. On the issue of the alleged negligence of the defendant Highway Department of South Carolina, I agree with my brethren that the Department was negligent in continuing to maintain, as of December 11, 1977, a cable which was invisible at night.
 
 
 135
 2. On the issue of the alleged contributory negligence of Faust and his companions, I dissent from my brethren's opinion (a) that those plaintiffs were contributorily negligent and (b) that their supposed negligence was a cause of their injuries. But I do not suggest that, if it stood alone, this point would merit review by this court en banc or by the Supreme Court. However, if other points do merit such review, then it might be thought that this point would properly deserve further consideration.
 
 
 136
 3. Unlike my brethren, I do not regard the Eleventh Amendment as a barrier to the plaintiffs' claim. (a) One reason is that Congress has the constitutional power to require a state to respond in a federal court to the suit of a plaintiff who claims that he was injured over navigable waters as to which the United States has paramount power. Admittedly, here the Congress has not in haec verba so required. But in a plethora of recent enactments Congress has subjected to liability not only others but, as the Federal Tort Claims Act emphasizes, the federal government itself to an obligation to meet in the United States Courts this type of claim. Only one who seeks a formal, technically-apt declaration would insist on more proof that Congress has adopted a policy of imposing liability on South Carolina. (b) A quite independent reason for my conclusion that the State of South Carolina cannot successfully invoke the Eleventh Amendment is that the State has clearly waived the application of that Amendment. The correspondence of the parties shows that South Carolina consciously chose to be subject to liability as the price of continuing the cable in operation. In his April 7, 1977 letter Cobb informed Judge Blatt that the Highway Department was discussing with the South Carolina Attorney General the very course of conduct the Department adopted: i.e., "continued operation of the present ferry, with the liability that may be involved." What South Carolina's authorized representatives meant by "the liability that may be involved" is indisputable: it is the kind of liability on which Judge Blatt had premised judgment in Doyle v. U.S., supra. That is the very type of liability upon which rests the district court's judgment in this case. (c) A further independent reason for my conclusion is that a waiver should be implied because it is plain that the United States would not have licensed South Carolina, and South Carolina would not have expected to receive a license from the United States, to lay a cable across navigable waters unless the State of South Carolina had impliedly, if not expressly, agreed to be liable for any injuries caused travellers by the negligent construction, operation, or maintenance of that cable. If such a cable were negligently constructed, operated, or maintained, the government of the United States would have been at least arguably (and, as this opinion declared, would indeed have been) liable for injuries caused by the continued operation of the cable. The liability is that which flows from ownership of an area upon which, with the owner's consent, another person created or maintained the structure which caused the damage for which compensation is sought.
 
 
 137
 4. Contrary to my brethren, I regard the liability of the United States to the plaintiffs as fully supported by the Federal Tort Claims Act. If we had a suit against the City of Charleston, South Carolina, for an injury caused to the plaintiff by a barrier a third person negligently erected to block a public road, the City as owner of the roadway would be liable to the plaintiff. Pari passu the United States is liable to these plaintiffs.
 
 APPENDIX
 
 138
 Sec. 3-35. The Eleventh Amendment as an Exemplification of Sovereign Immunity
 
 
 139
 In Chisholm v. Georgia,[1] the Supreme Court accepted original jurisdiction of a suit brought against the State of Georgia by two South Carolina citizens to collect a debt owed an estate. The Court took article III literally, refusing to condition the constitutional grant of authority to the federal courts to adjudicate "Controversies ... between a State and Citizens of another State"[2] on the defendant state's consent to suit. Response to Chisholm was not mixed. The Georgia House of Representatives was so exercised by the decision that it made any attempt to carry out the Supreme Court's mandate a felony punishable by hanging without benefit of clergy.[3] Other reactions were only less extreme. At least part of the anti-Chisholm clamor sounded in self-interest: the states feared ruinous suits on Revolutionary War debts.[4] Contemporary critics, jealous and perhaps fearful of the newly created power of the federal judiciary, must also have heard the whisper of betrayal, for the most ardent constitutionalists had given positive assurances that article III did not work a surrender of state sovereign immunity.[5] Within five years, Chisholm could claim the distinction of being the first Supreme Court case to be overruled by a constitutional amendment.
 
 
 140
 Eleventh amendment[6] jurisprudence has left no doubt that the amendment not only reversed Chisholm, but also countermanded any judicial inclination to interpret article III as a self-executing abrogation of state immunity from suit, thereby reinstating the original understanding that the states surrendered sovereign immunity only to the extent inherent "in the acceptance of the constitutional plan."[7] It is therefore not surprising that the Supreme Court, in deciding eleventh amendment cases, has focused not on the language of the eleventh amendment, but on the concept of sovereign immunity of which it is a reminder and "exemplification."[8] Thus, unlike the identical reference to "the judicial Power of the United States" in article III--a power which cannot be expanded by legislation[9] or by consent of the parties to a lawsuit[10] --the language of the eleventh amendment has not been interpreted to prohibit a suit once a state has given its consent.[11] Under a similarly flexible interpretation, suits against nonconsenting states brought by foreign nations are barred,[12] although this array of parties is not proscribed by the terms of the constitutional provision.
 
 
 141
 The Supreme Court's understanding of the principle of sovereign immunity has, however, recognized that "acceptance of the constitutional plan" puts some limitations on the power of a state to avoid suit. Suits brought by sister states[13] or by the United States[14] are thus not prohibited. And neither sovereign immunity nor the eleventh amendment bars Supreme Court review of state court judgments in suits in which a state is a party, since supremacy of federal law requires review of the federal questions presented by such judgments.[15] If concerns of federalism are not present, however, a different result follows. Where the plaintiff is nominally another state but the suit is actually for the benefit of a discrete group of private citizens, eleventh amendment immunity can be invoked by the defendant state.[16]
 
 
 142
 A consistent vision of the eleventh amendment and state sovereign immunity is most severely tested by suits in which a plaintiff seeks relief on the basis of an asserted federal constitutional right. It is at least arguable that, in ratifying the constitutional plan, the states surrendered sovereign immunity from suits testing the constitutional limits of state action.[17] As a doctrinal matter, however, the law is settled the other way, for Hans v. Louisiana[18] is conventionally thought to stand for the proposition that sovereign immunity bars even suits arising under the Constitution or laws of the United States.[19] In Hans, a citizen of Louisiana sued to recover damages, alleging that the state's failure to pay its bonds violated the contract clause of the Constitution.[20] Although Hans might easily be limited on the ground that an opposite holding would have resurrected Chisholm to the extent of making states legally liable on their debts, it has not been so narrowed.
 
 
 143
 The rule of Hans has not, however, totally frustrated attempts to use the judiciary to protect individual rights from unconstitutional state action. Instead, the courts have distinguished suits against the state from suits against an individual officer even though compliance by the officer will often be compliance by the state and the costs of compliance will be borne by the state treasury.[21] Under this distinction, two principal types of cases have been allowed to proceed. First, suits for money damages against an agent of the state in the agent's individual capacity are not barred: the damages are payable by the officer, provided primary and remedial law gives the plaintiff a cause of action against the officer for the specific actions contested.[22] Second, if the plaintiff does not make the gross pleading error of naming the state as defendant, injunctive relief against a state officer is not prohibited.[23]
 
 
 144
 That the Court has thought it necessary to continue the unsatisfactory and conceptually unruly distinction between actions against a state officer individually and actions against the state[24] is itself testimony to the vitality of sovereign immunity in the constitutional scheme. Although the effect of sovereign immunity on the availability of judicial review has been narrowed by fiction, the operational concept of a sovereign immunity that is secure against judicial inroads has been retained in at least the core area of damage suits and of injunctions against the state as such. It is thus not surprising that, when the Supreme Court began to consider the power of Congress to authorize damage suits against the states under article I, it exhibited a schizophrenic approach: the Court proceeded simultaneously on the premise that states had retained a sovereign immunity which could be sacrificed only by a subsequent waiver, and on the premise that states had ceded part of their sovereignty to the national government in ratifying article I, thereby creating a limitation on sovereign immunity inhering in "the acceptance of the constitutional plan."[25]
 
 
 145
 Sec. 3-36. The Conundrum of Constructive Waiver
 
 
 146
 Prior to 1964, eleventh amendment cases imposed an exacting requirement of proof of state consent to suit: "express language or ... such overwhelming implication from the text [of the state statute claimed to waive immunity] as would leave no room for any other reasonable construction."[1] But in Parden v. Terminal Railway,[2] the Supreme Court employed a new concept of "constructive waiver" to remove the eleventh amendment bar to a negligence action brought by Alabama citizens under the Federal Employers Liability Act (FELA) against a railway owned by the State of Alabama and operated by it in interstate commerce. The Alabama constitution and Alabama Supreme Court decisions foreclosed the possibility that the state had actually "consented" to the suit under traditional standards. The FELA, however, specifically provided that "[e]very common carrier by railroad" engaged in interstate commerce would be liable in damages to injured employees in "an action ... brought in a district court of the United States...."[3] The Parden Court held that this legislation transmuted the state's operation of the railroad into a constructive "waiver" of eleventh amendment immunity.[4] It insisted that Congress' power to regulate interstate commerce, delegated by the states in article I, is plenary and thus necessarily brooks no restraint by the states on its exercise.[5] When Congress has authorized federal courts to entertain suits in the necessary and proper furtherance of the regulation of interstate commerce, sovereign immunity can be no bar.[6] For this reason, Alabama by its actions in operating a railroad subject to national regulation had "necessarily consented to such suit as was authorized by" the FELA.[7] The Parden Court refused to make state law dispositive of the waiver question, fearing that Congress' article I power would be rendered "meaningless if the State ... could conclusively deny the waiver...."[8] Thus, Parden clearly indicated that even a contemporaneous state expression of nonconsent could be disregarded: "Where a State's consent ... is alleged to arise from an act ... within a sphere ... subject to the constitutional power of the Federal Government, the question whether the State's act constitutes the alleged consent is one of federal law."[9]
 
 
 147
 In the 1973 case of Employees v. Department of Public Health and Welfare,[10] the Supreme Court reaffirmed Congress' power to bring "the States to heel, in the sense of lifting their immunity from suit in a federal court," but signaled that exercise of such power would not be presumed without clear evidence of congressional purpose. Thus, although section 16(b) of the Fair Labor Standards Act (FLSA) made employers liable to private damage suits "in any court of competent jurisdiction,"[11] the Court declined to construe a 1966 amendment extending the Act's coverage to state hospitals and schools[12] as enforcing a corresponding waiver of eleventh amendment immunity.[13] The Court indicated that the authority of the Secretary of Labor to bring suit to enjoin further violation and recover unpaid wages adequately safeguarded federal interests in FLSA enforcement.[14] The stark result in Employees, however, was that the remedies available for FLSA violations affecting public employees were limited by the preexisting presumption that "a federal court is not competent to render judgment against a nonconsenting State."[15]
 
 
 148
 Edelman v. Jordan,[16] decided in 1974, continued the Court's chary approach to constructive waiver. The Edelman Court held that a federal district court could not order Illinois officials to "release and remit" federally-subsidized welfare benefits illegally withheld from Illinois citizens.[17] The Court concluded that state participation in a federal program could not in itself be taken to signify "consent on the part of the State to be sued in the federal courts."[18] State officers may be sued in federal court to compel future compliance with welfare regulations,[19] but the Court declined to find constructive waiver where the "only language in the [federal legislation] which purported to provide a federal sanction against a State [by cutting off future funds] ... by its terms did not authorize suit against anyone...."[20]
 
 
 149
 Finally, in Fitzpatrick v. Bitzer,[21] the Court found the clear evidence of congressional purpose it could not find in Employees and Edelman. Congress, in adopting the Equal Employment Opportunity Act of 1972,[22] had amended Title VII of the Civil Rights Act of 1964[23] to include "governments, governmental agencies [and] political subdivisions"[24] among the employers subject to Title VII's prohibition of discriminatory employment practices and its corollary authorization of employee back pay actions. Such congressional action, the Fitzpatrick Court concluded, revealed "congressional intent to abrogate the immunity conferred by the eleventh amendment" to be "clearly present."[25] Thus, the prerequisite for application of Parden's constructive waiver doctrine, absent in Employees and Edelman, had at last been met; the only issue was whether Congress in this case indeed possessed the power to roll back the states' eleventh amendment immunity. Treating the 1972 Act as an exercise of congressional authority under Sec. 5 of the fourteenth amendment, the Court held that Congress could in fact require the states to provide back pay to victims of the states' discrimination: "When Congress acts pursuant to Sec. 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional amendment whose other sections by their own terms embody limitations on state authority."[26]
 
 
 150
 In the decade following Parden, the Supreme Court's stance on eleventh amendment issues had significantly shifted. Parden would make states amenable to suit in federal court whenever they undertake an activity for which a private person could potentially be held liable under a valid federal law.[27] The Parden majority thus posited no distinction between the states and other entities that might be regulated by federal legislation. Employees and Edelman, on the other hand, treat states as distinguished from other entities by federalism considerations.[28] For this reason, the amenability of states to suit must be specifically addressed by federal legislation, and Congress must make its intention to treat states like private parties unmistakably clear.[29] This policy of clear statement had been rejected by the Parden majority, but Justice White's formulation of the policy in his Parden dissent eventually prevailed:[30] It should not be easily inferred that Congress, in legislating pursuant to one article of the Constitution, intended to effect an automatic and compulsory waiver of rights arising under another. Only when Congress has clearly considered the problem and expressly declared that any State which undertakes given regulable conduct will be deemed thereby to have waived its immunity should courts disallow the invocation of this defense. Thus in Employees, Justice Douglas searched the FLSA legislative history in vain for "a word ... to indicate a purpose of Congress to make it possible for a citizen ... to sue the State in the federal courts."[31] And in Edelman, the Court indicated that, in the absence of waiver, it could not find an abrogation of eleventh amendment immunity unless satisfied that the "threshold fact of congressional authorization to sue a class of defendants which literally includes States" had been established.[32] Fitzpatrick also took the clear statement tack; although he invoked Parden, Justice Rehnquist did not actually rely upon Parden's broad rule, but rather grounded his approval of the congressional action in the fourteenth amendment's specific limitations on state sovereignity.
 
 
 151
 Justice Marshall has charted yet another course.[33] On his view, the original grant of federal judicial power in article III did not authorize federal courts to entertain suits against non-consenting states; Chisholm was an unfortunate mistake; and the eleventh amendment was necessary to reestablish one of the bedrock political conceptions underlying article III.[34] Because eleventh amendment immunity thus reaffirms a right retained by the states, it can be relinquished only by "the sort of voluntary choice which we generally associate with the concept of constitutional waiver."[35] Absent such a choice, Justice Marshall would deny that even the most explicit congressional specification of state amenability to suit can empower a federal court to hear a case.[36] Justice Marshall was, however, willing to find waiver in the circumstances of Parden where Alabama had "legal notice" of the FELA prior to beginning its railroad operations.[37] The difficulty with Justice Marshall's position, however, is that it proves too much. For if states have a right under article III and the eleventh amendment not to be subjected to unconsented suits in federal court, then it would seem that Congress lacks the power to condition even their subsequent entry into various activities upon state forfeiture of that right, however knowing and voluntary.[38] Even a state that "chose to participate in an unconstitutionally conditioned program with its eyes wide open"[39] would presumably be protected against imposition of an independently offensive condition. The only ready escape from that conclusion is to deny that the state in fact has a right, in the sense that private persons have rights, against congressionally compelled amenability to suit in federal court.[40] This possibility in turn suggests a broader reformulation of the theory underlying Parden and its progeny.
 
 
 152
 Sec. 3-37. An Alternative Theory of Eleventh Amendment Abrogation
 
 
 153
 The only satisfying reconciliation of the cases with a conception of the eleventh amendment as either conferring a category of rights upon the states or at least confirming the states' retention of rights against unconsented suit, is to distinguish rights conferred against the federal judiciary from rights conferred against Congress. Nothing in the language or the history of the eleventh amendment suggests that it must be construed to limit congressional power under the commerce clause or under any other head of affirmative legislative authority. A better account of the relationship between the substantive lawmaking competence delegated by article I and the federal judicial power delimited by article III is available.
 
 
 154
 Article III permits federal adjudication of suits against states that are properly authorized pursuant to article I, but article III does not of its own force abrogate the defense of sovereign immunity when that defense would otherwise be cognizable in federal court. Five years after Chisholm v. Georgia[1] had erroneously construed article III to the contrary, the eleventh amendment, in declaring that the federal "judicial power ... shall not be [so] construed," restored the original understanding. But in scuttling the notion that article III had the self-executing effect of abrogating state sovereign immunity in federal tribunals, the eleventh amendment carved no new limits for the permissible reach of otherwise valid federal legislation. On this view, it remains true after the eleventh amendment, just as it was true prior to Chisholm, that Congress, acting in accordance with its article I powers as augmented by the necessary and proper clause, or acting pursuant to the enforcement clauses of various constitutional amendments,[2] can effectuate the valid substantive purposes of federal law by (1) compelling states to submit to adjudication in federal courts and/or (2) compelling states to entertain designated federal claims in their own courts.
 
 
 155
 The soundness of the approach advocated here depends in large measure upon the justifiability of treating congressional decisions to make jurisdictional inroads upon state sovereignty as different in kind from judicial decisions to do so. Such a difference in treatment is clearly not prohibited by the language of the eleventh amendment, which literally limits only the judicial power. It is also consistent with limitations on sovereignty inhering in the constitutional plan. Article I envisions that the national government will have plenary power to regulate certain subjects when, in the clearly expressed opinion of Congress, such regulation would serve the nation's interests. Moreover, as Fitzpatrick v. Bitzer[3] explicitly recognizes, the fourteenth amendment, also an important source of congressional power, is itself framed as a limit on state action. To the extent that sovereign immunity would free a state from such national controls, that immunity is inconsistent with the constitutional plan.[4] In addition, it has generally been perceived that the states are well represented in Congress, so that Congress will be attentive to concerns of state governments as separate sovereigns.[5] Subject to the state sovereignty limit implied in the tenth amendment,[6] this analysis merely extends that perception into a means of assessing the proper reach of state litigational immunity in the federal system.
 
 
 156
 As a corollary, the clear statement approach of Employees and Edelman[7] would be retained under the approach advocated here, albeit for the somewhat different reason that courts should not abrogate state immunity unless they are sure that Congress has considered the federalism interests compromised by suits against states. By making a law unenforceable against the states unless a contrary intent is apparent in the language of the statute, the clear statement rule would further ensure that attempts to limit state power will be unmistakable, thereby structuring the legislative process to allow the centrifugal forces in Congress the greatest opportunity to protect the states' interests.[8] Thus a recognition of the peculiar institutional competence of Congress in adjusting federal power relationships makes this an appropriate and useful approach to reconciling national power with state litigational immunity.[9]
 
 
 157
 Congressional power to abrogate the states' sovereign immunity is not, however, completely unfettered. Three limiting principles seem to follow from the constitutional plan. First, Congress cannot confer upon an article III court any authority to resolve disputes outside the textual confines of that article.[10] Second, any congressional attempt to confer jurisdiction and abrogate immunity must be reasonably ancillary to an otherwise valid substantive exercise of federal lawmaking power. Third, insofar as the tenth amendment "expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system",[11] the Supreme Court should not lightly infer serious congressional inroads upon state autonomy. In particular, the clearer the history of state attempts to immunize institutions and activities from accountability in a federal forum, and the more onerous the restriction on state options represented by a coerced waiver of immunity,[12] the more courts should insist that Congress act in a fashion demonstrating full appreciation of the consequences for federalism. To be sure, a sufficiently "drastic invasion of state sovereignty"[13] could be invalidated notwithstanding even the clearest possible expression of congressional purpose, but any such invalidation would rest ultimately on tenth rather than eleventh amendment grounds.[14]
 
 
 158
 The theory suggested here would certainly lead to the same result in Fitzpatrick; it would probably lead to the same result in Parden in light of the relative clarity of the FELA and the proprietary character of the railroad activity there involved, and to the same results in Employees and Edelman in light of the governmental character of the activities involved in both cases and the lack of clear congressional statement in either.[15] 5] But in other situations the theory could well produce different results from those indicated by a search for constructive waiver;[16] it would comport better with the notion that waivers of constitutional rights cannot be demanded as a condition of receiving a government benefit; and it seems more faithful to the history of the eleventh amendment itself.[17]ORDER AND DISSENT
 
 
 159
 Upon consideration of the appellees' petition for rehearing and suggestion for rehearing en banc, and no judge having requested a poll on the suggestion for rehearing en banc,
 
 
 160
 IT IS ADJUDGED and ORDERED that the petition for rehearing is denied.
 
 
 161
 Entered at the direction of Judge Winter with the concurrence of Judge Widener. Judge Wyzanski dissents for the reasons set forth in his supplemental dissenting opinion.
 
 
 162
 WYZANSKI, Senior District Judge, voting in favor of plaintiffs-appellees' petition for rehearing:
 
 
 163
 1. The facts in this case are undisputed. The assuredly most comprehensive, and it seems to me the most accurate, version is set forth in my dissent. From that dissent the majority unabashedly draw such portions as seemed to it appropriate for its majority opinion. No party disagrees, at least in print, with the factual summary given in the dissent I have written.
 
 
 164
 2. So far as concerns the defendants' negligence, this court like the district court has agreed that the plaintiffs have proved their case so far as concerns The Highway Department of South Carolina. The only reason that the majority of this court relieves the Department from liability is the Eleventh Amendment.
 
 
 165
 3. With respect to the negligence of the United States, the district court and I have no difficulty in holding the United States liable. Apparently both of us agree that the non-statutory principles of admiralty law, akin to principles of tort, make the United States liable. It is one of such principles that the United States, as the government which owns, controls, and exercises paramount power with respect to marine highways on navigable waters, when it expressly or impliedly licenses another to create and maintain in such waters a dangerous structure, and the United States knows of that danger and does less than a prudent, reasonable person would do to remove or alter or prohibit the structure, and such failure causes injury to a third person, the United States is liable for such injury. THE DENIAL OF THAT PRINCIPLE BY THE MAJORITY OPINION HAS RESULTED IN A JUDGMENT WHICH SEEMS TO ME PLAINLY AT ODDS WITH ELEMENTARY DOCTRINE, AND IF LEFT STANDING BOUND TO CREATE MISCHIEF. (The statutory theories of the district court and their discrediting by the majority of this court, I need not consider.)
 
 
 166
 4. With respect to the issue of the liability of the South Carolina's agency, I believe that the majority has based its judgment on a misunderstanding and erroneous application of the Eleventh Amendment to the United States Constitution and of such interpreting Supreme Court opinions as Parden v. Terminal Railway, 377 U.S. 184 (1964). As explained in my dissent, it is my view that:
 
 
 167
 (a) the majority has misapplied a Supreme Court governing precedent,
 
 
 168
 (b) the majority has failed to recognize that the facts of this case involve a waiver (of the type recognized by the Supreme Court) by the State of South Carolina of any immunity otherwise available to it under the Eleventh Amendment, and
 
 
 169
 (c) the majority has failed to recognize that when a state accepts from the federal government a license to create a structure upon navigable waters, the state engages in an activity which if it causes injury to another does not fall within the scope of the Eleventh Amendment, [a point expressly made again and again in decisions by the Supreme Court and inferior federal courts, as we ourselves illustrated in Chesapeake Bay Bridge and Tunnel District v. Lauritzen, 404 F.2d 1001 (4 Cir.1968) per Haynsworth, C.J., now called by the majority "not a viable authority and [one which] should no longer be followed."]
 
 
 
 *
 Honorable Charles Edward Wyzanski, Jr., Senior United States District Judge for the District of Massachusetts, sitting by designation
 
 
 [1]
 One such collision was litigated in Doyle v. United States, 441 F.Supp. 701 (D.S.C.1977). There recovery was sought from both the United States and South Carolina. South Carolina settled the suit, and the district court held the United States liable under 14 U.S.C. Sec. 86 for failure to mark the cable adequately. Subsequent to that case, some additional warnings were established
 
 
 [2]
 The SIAA permits suits in admiralty against the United States "In cases where ... if a private person or property were involved, a proceeding in admiralty could be maintained ...." That is, it renders the United States liable to suit to the same extent that a private person would be liable. Lane, 529 F.2d at 179
 
 
 [3]
 In Doyle v. United States, supra note 1, liability of the United States in a similar accident was predicated upon this provision
 
 
 [4]
 The United States may be held liable under the Rivers and Harbors Act if it places an obstruction in navigable waterways in violation of its provisions. See, e.g., Norfolk & Western Co. v. United States, 641 F.2d 1201 (6 Cir.1980); The Snug Harbor, 40 F.2d 27 (4 Cir.1930)
 
 
 [5]
 The parties concede that Highway Department is an agency of the State of South Carolina and a suit against Highway Department is a suit against the state
 
 
 [6]
 The Amendment reads as follows:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 [1]
 Norman Sturkie, employee of the Department of Highways and Public Transportation, testified at Tr. Vol. I, p. 173 as follows:
 "When a person approached this cable that you have described for us, was it visible at night, sir?"
 "No, sir."
 
 
 [1]
 2 U.S. (2 Dall.) 419 (1793)
 2 U.S.Const. art. III, Sec. 2.
 
 
 [3]
 See G. Gunther, Cases and Materials on Constitutional Law 49 (9th ed. 1975)
 
 
 [4]
 See Cullison, "Interpretation of the Eleventh Amendment," 5 Houston L.Rev. 1, 7, 9, 16 (1967); Jaffe, "Suits Against Governments and Officers: Sovereign Immunity," 77 Harv.L.Rev. 1, 19 (1963). Other pecuniary motives included the desire to avoid suits seeking restitution of confiscated Loyalist property and the desire to retain lands placed in the public domain by legislative fiat. See C. Jacobs, The Eleventh Amendment and Sovereign Immunity 57-62, 178 n. 72 (1972)
 
 
 [5]
 "It is inherent in the nature of sovereignty, not to be amenable to the suit of an individual without [the Sovereign's] consent. This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States ..." The Federalist No. 81, at 487-88 (C. Rossiter ed. 1961) (A. Hamilton). This Blackstonian rhetoric, compare W. Blackstone, Commentaries on the Laws of England, Book I, ch. 7, at 235 (1765), may have been as much political expedient as political theory. Pollock and Maitland found sovereign immunity in England to be an historical "accident" caused by the pyramidal structure of feudal courts, and not a basic idea implicit in any concept of sovereignty. See 1 F. Pollock & F. Maitland, History of English Law 518 (2d ed. 1898)
 
 
 [6]
 The eleventh amendment provides that: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI
 
 
 [7]
 Monaco v. Mississippi, 292 U.S. 313, 330 (1934). The quoted language is a paraphrase of Hamilton's language in The Federalist No. 81, quoted in note 5, supra. Hamilton's understanding that the states had not surrendered their sovereign immunity by ratifying article III is corroborated by statements of Madison and Marshall before the Virginia Convention. See 3 Elliot's Debates 533 (2d ed. 1901) (Madison); id. at 557 (Marshall), quoted in Monaco v. Mississippi, supra, at 323-24. The Monaco Court adopted Hamilton's view that the structure of the federal union implied that state sovereign immunity was limited in at least two cases: suits against a state by another state, see id. at 327-28; and suits by the United States against a state, see id. at 328-29
 
 
 [8]
 See, e.g., Ex parte New York, 256 U.S. 490, 497 (1921). See also H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 806-07 (tent.ed. 1958) (Court has treated eleventh amendment "as if it were a precedent to the opposite of Chisholm")
 
 
 [9]
 Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803)
 
 
 [10]
 See Louisville & N.R.R. v. Mottley, 211 U.S. 149 (1908); Mansfield, C. & L.M. Ry. v. Swan, 111 U.S. 379 (1884)
 
 
 [11]
 See Clark v. Barnard, 108 U.S. 436, 447 (1883) ("immunity from suit belonging to a State ... is a personal privilege which it may waive at pleasure")
 
 
 [12]
 Monaco v. Mississippi, 292 U.S. 313 (1934)
 
 
 [13]
 E.g., North Dakota v. Minnesota, 263 U.S. 365, 372-73 (1923)
 
 
 [14]
 E.g., United States v. Mississippi, 380 U.S. 128, 140-41 (1965)
 
 
 [15]
 Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 379-83, 407 (1821); accord, Smith v. Reeves, 178 U.S. 436, 445 (1900) (although state may limit consent to suits in its own courts, supremacy clause requires that federal questions decided be reviewable in the Supreme Court), discussed in Sec. 3-37, note 16, infra
 
 
 [16]
 E.g., New Hampshire v. Louisiana, 108 U.S. 76 (1883) (eleventh amendment bars suit where plaintiff state is actually bringing suit for individual citizens); Hawaii v. Standard Oil Co., 405 U.S. 251, 258-59 n. 12 (1972) (same). But see Employees v. Department of Pub. Health & Welfare, 411 U.S. 279, 286 (1973) (eleventh amendment does not bar suits by the Secretary of Labor on behalf of employees to collect back pay under Fair Labor Standards Act because suits by the United States are not barred by the amendment). See Sec. 3-37, note 15, infra
 
 
 [17]
 See, e.g., Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 379-83, 407 (1821)
 
 
 [18]
 134 U.S. 1 (1890)
 
 
 [19]
 See, e.g., Parden v. Terminal Ry., 377 U.S. 184, 186 (1964); accord, Duhne v. New Jersey, 251 U.S. 311, 313 (1920) (mem.) (suit to enjoin enforcement of eighteenth amendment barred); Smith v. Reeves, 178 U.S. 436, 446-48 (1900) (eleventh amendment bars suits arising under constitution); Fitts v. McGhee, 172 U.S. 516, 524-25 (1899) (suit alleging violation of due process clause barred)
 
 
 [20]
 See 134 U.S. at 1-2
 
 
 [21]
 The nature of the distinction drawn is most clearly articulated in Edelman v. Jordan, 415 U.S. 651 (1974), where the Court reversed a district court order requiring state welfare officials to pay out illegally withheld welfare benefits: "[The order] requires payments of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation." Id. at 668
 
 
 [22]
 See, e.g., Scheuer v. Rhodes, 416 U.S. 232, 237-38 (1974); Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 50-51 (1944); In re Ayers, 123 U.S. 443, 500-01 (1887) ("the defendants, though professing to act as officers of the State, are threatening a violation of the personal or property rights of the complainant"). See also United States v. Lee, 106 U.S. 196 (1882) (action in ejectment against United States officers not barred by sovereign immunity). See generally P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 930-37 (2d ed. 1973)
 One court has suggested that damage awards against an individual officer might violate the eleventh amendment if the officer were indemnified by the state. See Hallmark Clinic v. North Carolina Dep't of Human Res., 380 F.Supp. 1153, 1159-60 & n. 12 (E.D.N.C.1974) (three-judge court). See also Edelman v. Jordan, 415 U.S. 651, 664 (1974) ("These funds will obviously not be paid out of the pocket of petitioner Edelman"). Such a voluntary assumption of an officer's liability ought to be insufficient to create eleventh amendment immunity. In the parallel case of intergovernmental tax immunities, assumption by the federal executive of state taxes levied against a private party is not enough to create tax immunity. See Secs. 6-28 to 6-30, infra. For the same reasons, a state should not be able to turn a purely intramural arrangement with its officers into an extension of sovereign immunity. Alternatively, the state's voluntary extension of indemnification could be construed as a waiver of eleventh amendment immunity. See Sec. 3-36, infra.
 
 
 [23]
 Thus the seminal importance of Ex parte Young, 209 U.S. 123 (1908), which established an equitable cause of action against state officers in their individual capacities, the eleventh amendment notwithstanding, for violations of constitutional rights, and of Home Tel. & Tel. Co. v. City of Los Angeles, 227 U.S. 278 (1913), which established the fourteenth amendment as a substantive rule of conduct binding on state officials individually regardless of whether or not the state had officially sanctioned their actions. Young and Home Telephone thus enabled plaintiffs to allege "state action" sufficient to trigger the fourteenth amendment without automatically raising the bar of the eleventh. See Secs. 3-38, 18-4, infra
 
 
 [24]
 Compare, e.g., In re Ayers, 123 U.S. 443 (1887) (contract clause action; suit by owners of tax coupons to enjoin state officials from allegedly destroying market for coupons by bringing actions against all persons attempting to use the coupons; held, eleventh amendment bars suit), with, e.g., Georgia R.R. & Banking Co. v. Redwine, 342 U.S. 299 (1952) (contract clause action; plaintiff sought injunction to prevent assessment of ad valorem taxes contrary to legislative charter; held, eleventh amendment is no bar)
 
 
 [25]
 An excellent example of this schizophrenia can be found in Parden v. Terminal Ry., 377 U.S. 184, 192 (1964): "By empowering Congress to regulate commerce, then, the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation.... Our conclusion is simply that Alabama, when it began operation of an interstate railroad approximately 20 years after enactment of the FELA, necessarily consented to such suit as was authorized by that Act."
 
 
 [1]
 Murray v. Wilson Distilling Co., 213 U.S. 151, 171 (1909)
 
 
 [2]
 377 U.S. 184 (1964)
 
 
 [3]
 45 U.S.C.A. Secs. 51, 56
 
 
 [4]
 377 U.S. at 190-92
 
 
 [5]
 Id. at 192
 
 
 [6]
 Id
 
 
 [7]
 Id
 
 
 [8]
 Id. at 196
 
 
 [9]
 Id
 
 
 [10]
 411 U.S. 279, 283 (1973); see id. at 284-85
 
 
 [11]
 29 U.S.C.A. Sec. 216(b)
 
 
 [12]
 See id. Secs. 203(d), (r), (s)
 
 
 [13]
 See 411 U.S. at 285. The Court seemed influenced by two notions: first, that the schools and hospitals in Employees were somehow more an expression of "sovereign" power and less an extension of "proprietary" state interests than the railroad in Parden, see 411 U.S. at 284-85; Parden v. Terminal Ry., 377 U.S. 184, 196 (1964) (semble) ("when a State leaves the sphere that is exclusively its own"); and second, that the double damages provision of Sec. 16(b) appeared inconsistent with a "harmonious federalism," 411 U.S. at 286
 
 
 [14]
 411 U.S. at 285-86
 
 
 [15]
 Id. at 284
 
 
 [16]
 415 U.S. 651 (1974)
 
 
 [17]
 Federal regulations provided that benefits under the Aid to the Aged, Blind, and Disabled categorical grant program should be paid within a prescribed period following submission of a qualifying application. Illinois paid benefits only after applications were approved, even if state application review procedures overran the federal deadlines. Id. at 653-55 & nn. 3, 4
 
 
 [18]
 415 U.S. at 673
 
 
 [19]
 See, e.g., Graham v. Richardson, 403 U.S. 365 (1971); Goldberg v. Kelly, 397 U.S. 254 (1970). They may also be sued to compel them to share future costs of compliance with a decree remedying violations for which they shared responsibility. Milliken v. Bradley (II), 97 S.Ct. 2749 (1977)
 
 
 [20]
 415 U.S. at 674
 
 
 [21]
 427 U.S. 445 (1976)
 
 
 [22]
 86 Stat. 103
 
 
 [23]
 42 U.S.C.A. Sec. 2000e et seq
 
 
 [24]
 Id. Sec. 2000e(a); see 427 U.S. at 449 n. 2
 
 
 [25]
 427 U.S. at 451-52
 
 
 [26]
 Id. at 452. See Sec. 5-22, infra
 
 
 [27]
 See Employees, 411 U.S. at 300 (Brennan, J., dissenting); accord, Edelman, 415 U.S. 687-88 (Brennan, J., dissenting)
 
 
 [28]
 "[W]e decline to extend Parden to cover every exercise by Congress of its commerce power, where the purpose of Congress to give force to the supremacy clause by lifting the sovereignty of the States and putting the States on the same footing as other employers is not clear." Employees, 411 U.S. at 286-87
 
 
 [29]
 See Edelman, 415 U.S. at 672; Employees, 411 U.S. at 285 (unless Congress indicates "in some way by clear language that the constitutional immunity [is to be] swept away," the Court will not infer that Congress "desired silently to deprive the States" of immunity)
 
 
 [30]
 Parden, 377 U.S. at 198-99
 
 
 [31]
 411 U.S. at 285
 
 
 [32]
 415 U.S. at 672
 
 
 [33]
 See Employees, 411 U.S. at 287 (Marshall, J., concurring)
 
 
 [34]
 Id. at 290-91. In discussing Parden, however, Justice Marshall has indicated that he may consider the eleventh amendment as a restoration of power surrendered in the original constitutional scheme. See id. at 288-89. This, of course, would mean that Chisholm was right, and that the eleventh amendment corralled, but did not correct, the federal judiciary
 
 
 [35]
 Id. at 296. Although Justice Marshall's opinion in Employees used the idiom of private rights, he wisely did not posit a complete congruence between state immunities and private rights, concepts at best tenuously connected
 
 
 [36]
 Id. at 293-97. Justice Marshall argued that, although Congress could not compel a state to submit to a Sec. 16(b) suit in federal courts, it could compel such submission in state courts. See id. at 297-98. It is not clear, however, whether Justice Marshall based his assertion that the eleventh amendment is "nothing more than a regulation of the forum," id. at 298, in which a federal-question plaintiff may sue a state, on an analysis of Congress' article I powers or on an analogy to Testa v. Katt, 330 U.S. 386 (1947), which established a general constitutional duty for states to vindicate federal claims in their own courts to the extent they would entertain parallel state claims. The former proposition presents no difficulty, but the latter is too sanguine a reading of Testa, which required state courts to award multiple damages as prescribed by federal law where state law provided for multiple damage remedies. It is well established that a state may not discriminate against federal claims. Compare Douglas v. New York, N.H. & H.R.R., 279 U.S. 377 (1929) (state is not obliged to entertain nonresident's FELA claim against foreign corporation where state law denies jurisdiction in similar state cause of action suits), with McKnett v. St. Louis & S.F. Ry., 292 U.S. 230 (1934) (if state entertains all other suits against foreign corporations, it may not decline to hear FELA claim against foreign corporation). But Justice Marshall would apparently require state courts to entertain FLSA suits against the state whenever the state law includes an analogous wage-and-hour statute, even though state law gives no cause of action against the state itself. See 411 U.S. at 297-98 & n. 12. This clearly oversteps Testa's bounds: How can a state be charged with discrimination against a federal claim when it allows no suits in state courts against the sovereign?
 
 
 [37]
 411 U.S. at 296
 
 
 [38]
 See, e.g., Terral v. Burke Const. Co., 257 U.S. 529 (1922) (corporation cannot be compelled to waive right to resort to federal courts in order to do business in state); cf. Shapiro v. Thompson, 394 U.S. 618 (1969) (durational residency requirement for receipt of welfare benefits invalidated as burden on right to travel); United States v. Jackson, 390 U.S. 570 (1968) (unconstitutional to force defendant to choose between guilty plea and trial by jury where jury, but not judge, could impose death penalty). See generally Hale, "Unconstitutional Conditions and Constitutional Rights," 35 Colum.L.Rev. 321 (1935); Note, "Unconstitutional Conditions," 73 Harv.L.Rev. 1595 (1960); Note, "Another Look at Unconstitutional Conditions", 117 U.Pa.L.Rev. 144 (1968). But see note 35, supra
 
 
 [39]
 Edelman, 415 U.S. at 693 (Marshall, J., dissenting)
 
 
 [40]
 Another possible alternative would be to approve enforced waiver only when the need is "compelling." Cf. Storer v. Brown, 415 U.S. 724, 728-37 (1974) (statute burdening right to vote upheld because of compelling state interest). Such an approach, however, partakes of the difficulty inherent in distinguishing between measures that are merely rationally related to achieving a legitimate federal purpose and those that are absolutely necessary. See Note, "The First Amendment Overbreadth Doctrine," 83 Harv.L.Rev. 844, 914 (1970). Moreover, a case-by-case search for "compelling" federal interests in coerced waiver of state immunity would enable the federal courts to deny sovereign immunity on the basis of their independent evaluation of federal interests; this would be tantamount to using the article III grant of federal question jurisdiction to abrogate sovereign immunity, a result against which the eleventh amendment surely argues. See, e.g., Employees v. Department of Pub. Health & Welfare, 411 U.S. 279 (1973) (federal question jurisdiction insufficient to prevent successful plea of sovereign immunity); Duhne v. New Jersey, 251 U.S. 311, (1920) (same); Hans v. Louisiana, 134 U.S. 1, 15 (1890) (same)
 
 
 [1]
 2 U.S. (2 Dall.) 419 (1793)
 2 U.S. Const. amend. XIII, Sec. 2; id. amend. XIV, Sec. 5; id. amend. XV, Sec. 2; id. amend. XIX, cl. 2; id. amend. XXIV, Sec. 2; id. amend. XXVI, Sec. 2; see Katzenbach v. Morgan, 384 U.S. 641 (1966); cf. United States v. Mississippi, 380 U.S. 128 (1965) (suit in federal court by United States on behalf of individuals authorized under congressional implementation powers granted by Sec. 2 of the fifteenth amendment).
 
 
 [3]
 427 U.S. 445 (1976), discussed in Sec. 3-36, supra
 
 
 [4]
 See Parden v. Terminal Ry., 377 U.S. 184, 190, 192 (1964) (sovereign immunity would frustrate national legislation)
 
 
 [5]
 See, e.g., The Federalist No. 45, at 291 (C. Rossiter ed. 1961) (J. Madison) (federal power checked by state influence over President, Senate, and House of Representatives); id. No. 46, at 296 (tendency will be for Congress to have a local bias because of state representation); Wechsler, "The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government," 54 Colum.L.Rev. 543, 546 (1954). See also Cohen, "Congressional Power to Interpret Due Process and Equal Protection," 27 Stan.L.Rev. 603 (1975) (using doctrine of states' representation in Congress to justify congressional power under U.S. Const. amend. XIV, Sec. 5, to limit state power more severely than a court implementing id. Sec. 1); Mishkin, "Some Further Last Words on Erie--The Thread," 87 Harv.L.Rev. 1682, 1683, 1685 (1974) ("That Congress may have constitutional power to make federal law displacing state substantive policy does not imply an equal range of power for federal judges.... [in part because] the states, and their interests as such, are represented in the Congress but not in the federal courts."). Even if some of the means state governments could originally employ to influence Congress are no longer available, e.g., U.S. Const. amend. XVII (state legislatures no longer choose U.S. Senators), the comparative proposition that the interests of state governments are more likely to find voice in Congress than in the other two federal branches continues to remain persuasive. See generally Secs. 5-7, 5-20 to 5-22, infra
 
 
 [6]
 See Secs. 5-20 to 5-22, infra
 
 
 [7]
 Employees v. Department of Public Health & Welfare, 411 U.S. 279, 285 (1973); Edelman v. Jordan, 415 U.S. 651, 672 (1974), discussed in Sec. 3-36, supra
 
 
 [8]
 It is instructive that the Supreme Court has imposed such a clear statement requirement where state institutional interests would have been undermined by a judgment construing a federal statute's reach as coextensive with the commerce power. Thus, the Court has narrowly construed federal laws criminally punishing "conduct readily denounced as criminal by the States," United States v. Bass, 404 U.S. 336, 349 (1971), on the ground that, "unless Congress conveys its purposes clearly, it will not be deemed to have significantly changed the federal-state balance." Accord, United States v. Enmons, 410 U.S. 396 (1973); Rewis v. United States, 401 U.S. 808 (1971); United States v. Five Gambling Devices, 346 U.S. 441 (1953) (Jackson, J., plurality opinion)
 Once it is admitted that Congress can abrogate state sovereign immunity, a subsidiary question arises: Why must a court wait for Congress to act when Congress can always reverse what a court has done? The answer seems two-fold. First, the only operational meaning one can attribute to the concept of sovereign immunity is that, as with a political question, a court must accept another body's determination of an issue without reweighing the substantive balance to see if the court agrees. See Sec. 3-16, supra. Thus, allowing courts to "go first" would dilute the concept of immunity into virtual meaninglessness. Second, ratification by congressional silence is scarcely consistent with the considerations underlying the clear statement requirement. The point of that requirement is to make sure that state concerns are given an adequate airing in congressional processes of decision. Ex post consideration of sovereign immunity seems to depart from this attention to process, and is thus deficient, both (1) because it seems unlikely that Congress will actually take up a sovereign immunity complaint given the low motive power of abstract sovereignty concerns, see Wechsler, supra note 5, at 547-48; and (2) because, even if sovereign immunity is considered, it seems unlikely that Congress can be persuaded to reopen debate on the policy balance struck in a program already passed in order to "fine tune" that policy with respect to the states. There is, however, one situation in which judicial abrogation of sovereign immunity, subject to congressional veto, might be justified. When a court implies a remedy under a constitutional rule that limits both national and state power (e.g., due process), it seems more likely that the court will in the first instance consider the claims of the states since those may largely parallel those of the federal government. It also seems more likely that a decision infringing state interests in such a case might be overturned by Congress because "the interests of the states and nation in removing unduly intrusive common law would overlap, thereby maximizing the 'clout' which the states enjoy in Congress." Monaghan, "The Supreme Court, 1974 Term--Foreword: Constitutional Common Law," 89 Harv.L.Rev. 1, 37 (1975).
 
 
 [9]
 See Sec. 2-3, supra
 
 
 [10]
 Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803). But see National Mut. Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 591-92 (1949) (plurality opinion) ("It is too late to hold that judicial functions incidental to Art. I powers of Congress cannot be conferred on courts existing under Art. III....")
 
 
 [11]
 Fry v. United States, 421 U.S. 542, 547-48 n. 7 (1975). See National League of Cities v. Usery, 426 U.S. 833 (1976), discussed in Sec. 5-22, infra
 
 
 [12]
 The restriction on options is greatest when the state is put to the choice, as it would have been in Employees, between being dragooned into federal court by a private party and "ceasing operation of ... vital [pre-existing] public services," Employees v. Department of Pub. Health & Welfare, 411 U.S. 279, 296 (1973) (Marshall, J., concurring). These concerns are often encapsulated in the labels "sovereign" and "proprietary", see, e.g., Fry v. United States, 421 U.S. 542, 549 (1975) (Rehnquist, J., dissenting); Employees v. Department of Pub. Health & Welfare, 411 U.S. at 284-85, but unfortunately the boundary between the proprietary and the sovereign is both difficult to mark conceptually and difficult to locate over time. This guideline has been suggested less as a limit on congressional power to abrogate eleventh amendment immunity, cf. Maryland v. Wirtz, 392 U.S. 183, 195 (1968) (rejecting similar distinction in commerce clause case), than as a factor to be considered in determining how clearly Congress must express its purpose to abrogate state immunity with respect to the activity in question. For a suggested way of giving the guideline greater content, see Sec. 5-22, infra
 
 
 [13]
 Fry, 421 U.S. at 547-48 n. 7
 
 
 [14]
 Tenth amendment jurisprudence is discussed in Secs. 5-20 to 5-22, infra
 
 
 [15]
 Employees, however, permitted the Secretary of Labor to bring suit for back pay on behalf of aggrieved employees. The Court strangely did not apply the same standard of clear statement to language in the FLSA authorizing suit by the Secretary as it did to language providing for private damage actions. The Court may have assumed that such suits were automatically authorized because suits by the United States are not within the ban of the eleventh amendment, but it does seem anomalous that when a state brings suit on behalf of individuals (rather than in its sovereign capacity), the suit is barred, but is not barred when the federal government undertakes a similar enterprise. See Sec. 3-35, note 16, supra
 
 
 [16]
 This interpretation of the eleventh amendment suggests that the doctrine of Smith v. Reeves, 178 U.S. 436 (1900), be reconsidered. In Smith, the Court held that the eleventh amendment allowed a state to consent to suit in its own courts but to retain eleventh amendment immunity in federal courts. This doctrine has been applied in later cases without consideration of the qualifications imposed in Smith--that the legislation waiving sovereign immunity not evince any hostility toward the federal government, and that it not trench upon any federal right, see id. at 445. See, e.g., Murray v. Wilson Distilling Co., 213 U.S. 151, 172 (1909). If the eleventh amendment stands for no more than the proposition that article III is not a self-executing abrogation of state sovereign immunity, then the amendment alone should provide no justification for a state consent which discriminates against a federal instrumentality. Cf. United States v. City of Detroit, 355 U.S. 466, 473-74 (1958) (dictum) (state may not discriminate against United States in setting tax rates); Railway Co. v. Whitton's Adm'r, 80 U.S. (13 Wall.) 270 (1871) (state may not restrict general wrongful death cause of action to state courts). As was recognized in Smith itself, however, other factors--such as the necessities of administering a state tax system--may negate any inference of hostility, thereby validating the state's partial consent
 
 
 [17]
 See Nowak, "The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments," 75 Colum.L.Rev. 1413 (1975). The argument advanced here has been addressed to the narrow question of the eleventh amendment's impact on congressionally created damage (or injunction) actions running directly against the states. But the argument, which is based both on constitutional structure and on the peculiar characteristics of the federal legislative process, has implications for the larger question of when, if ever, it may be appropriate for a federal court to imply a cause of action for damages against the states. See, e.g., Brown v. Kentucky, 513 F.2d 333 (6th Cir.1975) (rule 10b-5 claim against Commonwealth of Kentucky held barred by eleventh amendment under Edelman and Employees); cf. Bivens v. Six Unknown Named Agents, 403 U.S. 388, 390-97 (1971) (damage remedy against federal officers); Monroe v. Pape, 365 U.S. 167 (1961) (damage action under 42 U.S.C.A. Sec. 1983 does not run against municipalities). With limited exceptions, e.g., Vermont v. New York, 417 U.S. 270, 277 (1974) (interstate disputes); Moragne v. States Marine Lines, Inc., 398 U.S. 375, 381-403 (1970) (admiralty), federal common law, see Sec. 3-31, supra, is grounded not on grants of jurisdiction in article III, but on the unavoidable lawmaking functions of a court asked to decide statutory questions, see, e.g., D'Oench, Duhme & Co., v. Federal Deposit Ins. Co., 315 U.S. 447, 470 (1942) (Jackson, J., concurring) ("Were we bereft of the common law, our federal system would be impotent. This follows from the recognized futility of attempting all-complete statutory codes, and is apparent from the terms of the Constitution itself"); or on grants of power to the national government, see, e.g., Note, "The Competence of Federal Courts to Formulate Rules of Decision", 77 Harv.L.Rev. 1084 (1964); or on limitations upon government found in various sections of the Constitution, see Monaghan, supra note 8. But see Dellinger, "Of Rights and Remedies: The Constitution as a Sword", 85 Harv.L.Rev. 1532, 1541-42 (1972) (common law based on article III). Thus, the eleventh amendment, understood merely as a reminder that article III is not a self-executing abrogation of sovereign immunity, arguably does not bar judicially implied damage remedies
 The simplicity of this conclusion is marred by two considerations. First, the argument presented here for Congress' power to abrogate state sovereign immunity is based both on constitutional structure and on peculiar characteristics of the legislative process making it reasonable to suppose that state interests will be adequately considered. It would be highly incongruous for a federal court to insist upon a policy of clear statement as a means of ensuring an adequate legislative consideration of states' interests if the legislative process itself were so unimportant that a court, finding no congressional intent to abrogate immunity, could simply create its own cause of action. Second, were courts to imply damage remedies, it would be difficult to identify the significance of the sovereign immunity preserved by Hans v. Louisiana, 134 U.S. 1 (1890), and kept alive, even after Ex parte Young, 209 U.S. 123 (1909), by the largely fictional device of distinguishing suits against state officers. In addition, the need to imply a damage remedy against a state is minimal. Since cities and other political subdivisions are not ordinarily sheltered by a state's eleventh amendment immunity, see, e.g., Mt. Healthy City School Dist. v. Doyle, 97 S.Ct. 568 (1977), and since state or municipal officers can be sued for damages and injunctive relief in their individual capacities for violations of federal rights, there would ordinarily be little occasion to augment a plaintiff's available remedies with a damage action against the state. Even in the unusual case, where the only defendant is the state, damage liability has been firmly rejected by the contract clause cases. See, e.g., Hans v. Louisiana, supra; In re Ayers, 123 U.S. 443 (1887). Although these considerations by no means conclusively demonstrate that courts should never imply damage remedies against the states, they at least suggest that courts should be hesitant to do so.